IN RE ESTATE OF ARISTEEN MOE.

CHARLES B. MILLS et al., Executors, Appellees, v. CHARLES N. MANCHESTER et al., Appellants.

No. 40826.

June 20, 1931.

Supplemental Opinion October 27, 1931.

Bailie & Edson, for appellants.

Whitney, Whitney & Stern, and E. M. Duroe, for appellees.

Albert, J.—Aristeen Moe died testate on November 30, 1923, and her will was admitted to probate in the district court

of Buena Vista County, Iowa, on the 4th day of January, 1924. So much of said will as is material to the questions involved will be referred to later.

Charles B. Mills Sr. and Charles B. Mills Jr. were appointed executors, without bond, in accordance with the terms of the will, and they qualified as such and letters testamentary were issued to them jointly on January 10, 1924. On the 13th day of January, 1925, they filed an inventory in this estate. So far as the record shows, nothing further was done in the estate until February 8, 1930, when a petition was filed asking the court to compel the executors to file a report in said estate. Whereupon, in March, 1930, the executors filed a report, and to such report certain of the legatees filed objections.

The assets of the estate, as appraised by the collateral inheritance tax appraisers of Buena Vista County, Iowa, on the 31st day of January, 1925, and the total value of the property of said estate were fixed by said appraisers at $47,141.54, whereupon the executors paid to the treasurer of the State of Iowa, as collateral tax on said estate, the sum of $2,315.33. The executors collected from the assets of this estate in cash the sum of $26,462.86.

Among the assets when taken over by the executors was a note made by the General Securities Company for $15,000.00, payable to Aristeen Moe and dated January 2, 1923. This note was secured by a pledge of 100 shares of stock of the First National Bank of Drayton, North Dakota. The General Securities Company was a corporation with its principal place of business in Minnesota. Its business was the buying and selling of securities, notes, handling land for others, collecting rents, etc. The stock in the General Securities Company consisted of 500 shares of which Charles B. Mills owned 497 shares. Charles B. Mills Sr. had charge of the general business of the General Securities Company. He gained control thereof in May, 1919, and had such control from that time on. In 1919, when Charles B. Mills Jr. returned from France, the father became interested in the First National Bank of Drayton, North Dakota, and he purchased 145 shares of stock therein on the 18th day of September, 1919. This bank had a capital stock of $25,000.00, the par value of the shares being $100 each, and by this purchase Charles B. Mills Sr. acquired the controlling interest in the bank, and

Charles B. Mills Jr. became assistant cashier thereof. The son purchased 10 shares of stock from his own funds. On December 23, 1920, the father transferred to the son 145 shares of stock in said bank previously purchased by him.

By reason of a surplus in said bank amounting to approximately $25,000.00, the interested parties cancelled the surplus and transferred it into new certificates of stock which were issued to the then holders of the outstanding stock, thus doubling the stock by increasing the capital to $50,000.00. Instead of holding, therefore, the 145 shares originally issued to the father and turned over to the son, this holding became 290 shares, and from this holding the 100 shares were taken which were put up as collateral security for the aforesaid $15,000.00 note, and they were so held in the hands of Aristeen Moe at the time of her death.

This stock, however, still stood on the books of the bank in the name of C. B. Mills Jr. until July 14, 1927. The other 190 shares were transferred to the General Securities Company, and were so held by it at the time the executors filed their inventory herein on the 31st day of January, 1925, and thereafter, Aristeen Moe, at the time of her death, held in her own name 20 shares of the stock of the First National Bank of Drayton. This, of course, is in addition to the 100 shares which she held as collateral to the $15,000.00 loan.

At this point it is sought to show that these executors at some time during these various transactions agreed to accept these 100 shares of stock in the North Dakota bank in full settlement of the $15,000.00 note of the General Securities Company. Passing for the moment the question of the right of the executors to make any such agreement, in the absence of the approval of the court, we have read this record with care and are disposed to the conclusion that no such arrangement was made. As heretofore said, the books of the bank showed that this 100 shares of stock were transferred to the executors on the 14th day of July, 1927, and contrary to the finding of the district court, we conclude that there never was a time in the history of these 100 shares of stock when they were other than pledged as collateral security, and the executors, as such, were never the absolute owners of said stock, and at the time of the hearing and at all

times previous, the executors held the same only as collateral security.

The North Dakota bank commenced to have serious financial troubles about January 1, 1925, to which attention was called by the Federal Government. In order to meet the criticism, the stockholders thereof agreed to put in $40,000.00 in cash to take up the slow paper. This was in April of the last-named year. C. B. Mills Sr. was asked if he did not know the bank was practically insolvent at that time and he answered "no, not after that was put in. When we put that $40,000.00 in there the bank was in good shape."

At that time the Moe estate was the actual owner of 20 shares of stock in this bank and held 100 shares as collateral. We assume the executors were parties to the aforesaid agreement to put up the $40,000.00 which amounted to 80% of the capital stock. This agreement was never submitted to the district court for approval, and whatever agreement the executors may have made was on their own motion. No question seems to be raised as to the payment of this assessment of 80% on the 20 shares actually owned by the Moe estate. However, as to the 100 shares, $4,000.00 was drawn from the Moe estate to pay one-half of the 80% assessment thereon, and of this the objectors to the report complain.

We have heretofore held that this 100 shares of stock were never owned by the Moe estate, and therefore, the $4,000.00 was not rightfully paid on this assessment. Owing to the general situation, this bank continued to have financial trouble, and in the Spring of 1927, the stockholders seem to have again agreed to make a contribution to the support of the bank, and at that time a note was given by the Moe estate (by the executors) for $3,600.00 to cover a 30% assessment on its stock. This note was later paid, together with interest thereon. It will be noticed that this amounts to a 30% assessment on 120 shares of stock. The amount of $600.00 being 30% on 20 shares of stock, is not questioned, but the $3,000.00 paid on this assessment is objected to by the legatees and we think rightfully so. It follows, therefore, that the $7,000.00 thus taken from this estate, was wrongfully taken therefrom and should be charged to the executors.

The thought of the district court in holding otherwise than as above, seems based on the proposition that the executors were

not guilty of bad faith in paying out these two amounts, and, therefore, it was not properly chargeable against them. With this we do not agree. The opinion is now becoming too extended to elaborate details, but after several readings of the record, we are led to the conclusion that the various shiftings of securities made in the case, many of which are not heretofore referred to, were for the purpose of transferring the liabilities on this bank stock which seemed to be in a failing condition, from persons actually liable thereon to this estate.

■ It is to be remembered that in the trial of objections of this kind to an executor's report, the burden of proof is upon the executor to sustain his report. In re Mowrey's Estate, 210 Iowa 923; In re Estate of Eschweiler, 202 Iowa 259.

An administrator has the burden of establishing the nonprejudicial nature of an irregular report. In re Estate of Eschweiler, supra.

The statutes of this State provide that it is the duty of an executor to close an estate within three years. Section 12044, Code, 1927. This estate had run over six years without an attempt to make a report to the court.

The inventory of an estate details the articles which come into the hands of the administrator, with which he charges himself, and the appraisal fixes the amount or value of the property, and establishes a basis upon which the accounting of the executors shall proceed; hence the above conclusion.

The court erred in giving credit to the executors in their account for this $7,000.00.

■ Another item of which complaint is made is one of $1,000.00 paid to the executors for fees for services in this estate. The lower court found there were no extraordinary services performed in this estate by the executors, and, therefore, held that they were only entitled to the maximum statutory fee which is computed at $649.24, and ordered these executors to restore to the fund the sum of $350.76. From this ruling the executors have appealed. We conclude, under the record made, the lower court was correct in this ruling and we approve its action in fixing the executors' fees at the above specified amount.

In the final report was also an item of $110.78 for taxes on real estate, which it was conceded should not be charged to this

estate, and the lower court ordered the executors to restore this amount to the funds of the estate. This has our approval.

The will of Aristeen Moe, after having ordered payment of her debts and funeral expenses, devised the home property in Sioux Rapids to the children of her two daughters. Its next provision was a devise and bequest "to C. B. Mills, Jr. in trust, the sum of $5,000.00, the income from which to be paid to Aristeen B. Manchester, daughter of my nephew, Charles N. Manchester, until she arrives at the age of twenty-five years, at which time the trust shall cease, and the bequest shall pass to her absolutely."

Among the assets of this estate at the time of the death of Aristeen Moe were 25 shares of bank stock, of the par value of $100 a share, in the State Bank of Laurens, Iowa. The executors testified that in order to meet this bequest, creating the trust as above set out in said will, they set aside this 25 shares of stock of said bank which they say they estimated to be worth $200 a share, considering that as the trust estate provided for in the above paragraph of the will. The appraisal value of this stock, however, as shown by the appraisement, was only $2,500.00, but be that as it may, the proportion provided by the will was $5,000.00 to be placed in this trust fund. The evidence shows that the executors have paid $1,000.00 to the beneficiary of this trust in four different installments, the last installment being paid in December, 1928. One of the executors testified that this was the interest on the $5,000.00 trust fund. The lower court held that the setting aside of these 25 shares of stock in the State Bank of Laurens did not meet the provisions of the will and could not be approved by the court. This stock was ultimately lost by the closing of the bank, and there is no reason why the loss should be shifted and charged against the *cestui que trust*. The lower court held that the loss must fall upon the estate and it must pay to C. B. Mills Jr., as trustee, to be held by him in trust under the terms of the will, his pro rata share of the bequest, less, of course, the sum of $125.00 which was properly paid by the executors as the inheritance tax against said fund.

The court further in his opinion said that in the calculation made by him he did not take into consideration the $1,000.00 thus paid because the executors had no authority to make such payment, and these items should not have been charged in their

account or disbursements of the funds belonging to the estate, and the fund belonging to the estate must be made good by these executors, regardless of these payments. With this conclusion we are not disposed to agree. If this estate had been conducted regularly, at the end of one year this trust estate would have been turned over to the trustee, and he would have been accountable to the *cestui que trust* for the legal rate of interest on the $5,000.00, or $300.00 a year, and the corpus of the trust estate would have passed out of the Moe estate. The trust estate, under the calculations we have made as later appears herein, of 69.7 cents on the dollar, would amount to $3,485.00, had the division been made when it should have been. Having received this $1,000.00, we think the same should be charged as an advance payment to the *cestui que trust*, and the pro rata share to be turned over by the executors to this trustee should be reduced by this $1,000.00.

 The executors, in making payment to certain legatees, retained certain amounts which represented the indebtedness of these legatees to the testatrix at the time of her death. This was the equivalent to the collection by the executors of so much indebtedness to the estate. These different amounts, handled as they were, did not change the account as between the executors and the estate, but were items to be taken into consideration in determining the pro rata share of each legatee. The aggregate amount of these collections, as nearly as we can determine from the record, is $579.79, which should be added to the other amounts collected by the executors in computing the pro rata of the legatees. We approve this order of the court.

The district court figured the amount chargeable against the executors as $27,042.65. The court gave credit to the executors in the sum of $9,497.72. It included therein a credit of $4,000 paid on the first assessment in the First National Bank of Drayton. Under our holding, the executors should not have had this credit.

 It appears from the record that certain of the legatees have been paid in full, whereas, as above shown, the estate was not sufficient in amount to pay any of the legacies in full. This was all done without order of the court, and, as said by the court, "these executors must be held responsible for their own acts. However, they are hereby authorized, empowered and di-

rected to take such steps as they may deem advisable and for the best interests of all concerned to recover back the excess amount paid to any of said legatees.''

Under the terms of the will, a bequest of $6,000.00 was made to a nephew, Charles M. Manchester. It was claimed that there was an overpayment to him of $344.00, and the court so held. In short, under the percentage which the court figured on each bequest, the record undoubtedly showed this over-payment, but under the percentage which we determine should have been the proper basis of calculation, this overpayment disappears.

On the appeal of the executors, the case is affirmed.

On the appeal of the objectors, the decree of the district court is modified in accordance with the findings in this opinion, and the case is remanded to the district court for further action in accordance with the decree entered by him as modified by the holdings in this opinion.—Modified and affirmed on executors' appeal; modified, affirmed, and remanded on the objectors' appeal.

FAVILLE, C. J., takes no part.

STEVENS, DE GRAFF, WAGNER, KINDIG and GRIMM, JJ., concur.

### SUPPLEMENTAL OPINION.

PER CURIAM: In the opinion in the above case it is said that there are certain shares of stock of the State Bank of Laurens which were lost by the closing of said bank. This statement is not quite accurate for the reason that such bank was reorganized and by reason of the shares of stock of the Moe Estate not participating in the re-organization, such shares became worthless.

Reference is also made in the opinion to the giving of a $3600 note to cover a 30% assessment on stock in the First National Bank of Drayton, North Dakota. The opinion recites: ''This note was later paid, together with interest thereon.'' This statement is also inaccurate as that note was not paid in full as will hereinafter be explained.

As to the $3600 note above referred to, no complaint is made

as to the $600 payment on said note representing the assessment on the 20 shares properly held by the Moe Estate.

As to the balance of said note, the record shows that $977.82 was paid thereon, and under our holding, this was a wrongful appropriation of the money of this estate. Deducting these two amounts from the credits given by the district court, we find that the credit which the executor should have is $4519.90, on which they are entitled to a credit of $1,000 advanced on the trust estate, making a grand total to which they are entitled of $5519.90. Deducting this from the amount charged against the executors, the amount on hand is $21,522.75. This amount apportioned among the legatees will pay 64.922 cents on the dollar of each of the legatees, and this percentage applied to the $5,000 trust in favor of Aristeen B. Manchester, figured on this basis, would be $3246.10 instead of $3485.00 as set out in the original opinion.

With these modifications, the petition for rehearing is overruled.