IN RE GUARDIANSHIP OF JOHN W. O'DONNELL AND THOMAS H. O'DONNELL, incompetents.

## No. 47556.

(Reported in 40 N.W. 2d 35)

December 13, 1949.

Havner & Powers, of Des Moines, for appellants.

Henry H. Griffiths, of Des Moines, guardian ad litem-appellee.

Harold H. Newcomb, of Des Moines, guardian-appellee.

James W. Wilson, of Des Moines, for Katie Heckman, claimant-appellee.

SMITH, J.—Katie Heckman, claimant, a sister of John W. and Thomas H. O'Donnell, was appointed guardian of their persons and property upon their voluntary application, February 17, 1933. They owned (by deed from their parents in 1900) a farm of one hundred sixty acres, subject to their mother's life estate therein. They were aged sixty-five and sixty-one years, respectively, and had never married. The extent or degree of their mental incompetence is in dispute. The mother died about the time of the guardianship appointment.

The present controversy grows out of claimant's application, filed November 29, 1947, for specific performance of an alleged oral contract (in 1931) between her and the wards that she would become owner of the farm and would furnish life care and support to the wards and their mother. She prayed in the alternative that if specific performance was not granted she be allowed reasonable compensation for the care, service and support already furnished and to be furnished by her in the future.

During the trial one ward, John W. O'Donnell, died and the objectors, (a brother, niece and nephew) were substituted as parties in his stead. They had already filed objections and a motion to strike it had been made by claimant but had not been ruled on when the ward died.

Another brother (Daniel), having been served with notice, filed a disclaimer of interest and asked that claimant be granted the relief she sought.

Upon filing of claimant's application, H. H. Griffiths, an attorney of Des Moines, was appointed guardian ad litem and thereafter filed answer stating the wards were "practically blind" and "because of age and infirmities and lack of education" were incompetent to handle their own affairs.

Eight days later (May 11, 1948) the wards filed an answer (with a sworn statement by Mr. Griffiths attached) in which they alleged the ownership and possession of the farm by them and their mother until her death in 1933; that in her lifetime their mother, with their knowledge and assent, made a verbal agreement with claimant that she and her family would remove to the land, look after and care for the mother and wards for their lives and become owner of the land; and that pursuant to said agreement claimant, with her husband and family, did remove to the farm, carry out the agreement until the mother's death and thereafter, and was still carrying out said agreement. They prayed approval of the oral agreement and its performance "to this time" by claimant, and such orders and decree "as shall be thought equitable." The application was signed by each ward, by mark, witnessed by Mr. Griffiths.

In his affidavit Mr. Griffiths stated: "* * * that he prepared the foregoing answer for his wards * * *; that he has acquainted the said wards with the said answer, and is assured by them of the truthfulness of the allegations thereof; that the said answer states the facts truly as he verily believes."

In the meantime, on December 8, 1947, objectors had applied for removal of claimant as guardian and objected to her application for specific performance or allowance of compensation; they urged that specific performance cannot be allowed in probate, that the wards were incompetent to contract, and that the alleged oral agreement was within the statute of frauds. They also de-

nied claimant's right to compensation because she had had possession and use of the premises and had never made any reports as guardian or rendered any accounting of the rents, revenues and crops. By amendment, after they became actual parties by substitution, objectors also alleged facts and considerations which they claimed estopped claimant from claiming ownership of the farm.

When the case came on for trial the court sustained objectors' motion and removed claimant as guardian "for the time" and appointed attorney Harold Newcomb of Des Moines as guardian of the property of the wards. The court also, on objectors' motion to transfer trial on Count I to equity, in effect, transferred it, saying: "* * * we can take such testimony as can be presented and apply it on Count I as an equity matter and on Count II as a normal probate matter." As a result the case was tried, in effect, as an equitable proceeding. All objected-to testimony was received subject to objection, and standing blanket objections were allowed as to certain lines of testimony. No rulings on evidence were made.

Prior to trial Mrs. Heckman, as guardian, filed a report in which she again alleged the making of the oral agreement (but with her mother as a party) and her performance of its terms. She alleged it was made in 1931, prior to her appointment in 1933, and that the wards were not of unsound mind or incompetent except "that owing to old age, they were troubled with blindness, a certain amount of deafness and some difficulty of speech." There was no account pleaded of either receipts or expenditures. It was alleged no money or property had come into her hands.

The special guardian, attorney Newcomb, filed an answer which set out the result of his investigation and prayed the court "to enter such orders and decrees herein as shall be just and equitable and to be performed or carried out by this guardian with respect to such property."

At the end of the trial the court made findings of fact and conclusions of law in the course of which it was concluded the alleged contract had not been established by the "clear, convincing and satisfactory testimony required." (There has been no appeal from that conclusion.) Compensation for care and support and allowance for expenditures were, however, decreed. The

amount was arrived at by crediting claimant for care and support of the wards at the rate of $65 per month each, plus money expended for taxes, clothing, medical attention, repairs and improvements, and charging her yearly rent at the rate of $7 per acre—all from March 1933 to date of judgment. The judgment is made a lien and the real estate ordered sold for payment of judgment and costs. Only the objectors appeal.

Appellants' brief reveals just two contentions: 1. Claimant was entitled to nothing, either as compensation for services or expenditures, because she never filed reports as required by statute. 2. The proof was insufficient to support allowance for expenditures.

Appellee's brief is joined in by both guardian ad litem and special guardian. The real controversy on appeal is therefore one between claimant and the remaining ward, on the one hand, and the objectors, being some of the heirs of the deceased ward and prospective heirs of the living ward, on the other.

I. We find no merit in the proposition that because of failure to file reports claimant may not recover for services and expenditures in furnishing care and support to the wards.

It is to be observed first she was guardian of both persons and property. She is making no claim here for guardian fees or commissions for the management of property or handling of funds. While she claims and the court allows a substantial amount for such expenditures as taxes, repairs and improvements, most of her claim is for care and support of the wards.

The objectors rely on section 668.24, Code, 1946, which requires all guardians to render account at least once each year "of all moneys or other property in their possession." The only property owned by these wards when the guardianship commenced was the real estate. This the guardian reported by inventory, filed March 7, 1933. There was no further property to account for thereafter except rental of the real estate.

This farm was the home of these wards who were incompetent physically (and to some extent mentally) to manage it and care for themselves. The mental condition existed apparently from birth. The mother had become physically unable to carry on when claimant and her husband took over. Under ordinary conditions the property would have been sold or rented by the

guardian and arrangement made for the wards to be cared for and supported elsewhere, such care and support to be paid for out of the proceeds or income.

But claimant and her husband were already in possession of and operating the farm and caring for the wards under some family arrangement with the mother, assented to by the wards. The trial court though holding the evidence insufficient to warrant specific performance, nevertheless held it sufficient to entitle claimant to recover on quantum meruit.

We have examined the Iowa cases cited by appellants and appellees. It is significant that both cite largely the same ones, viz., Foteaux v. Lepage, 6 (Clarke) Iowa 123; In re Guardianship of Anderson, 208 Iowa 191, 225 N.W. 258, 64 A.L.R. 687; In re Guardianship of Benson, 213 Iowa 492, 239 N.W. 79; In re Estate of Moe, 213 Iowa 95, 237 N.W. 228, 238 N.W. 718; In re Estate of Eschweiler, 202 Iowa 259, 209 N.W. 273.

These decisions do not bear out the contention made here by objectors-appellants. In fact we find no case in which the guardian has been denied reimbursement or compensation for support and care of the ward upon the sole ground of failure to make timely reports.

In Foteaux v. Lepage, supra, at pages 135, 136, it was said the guardian could be denied compensation for handling funds where he shows "a degree of carelessness and negligence in the discharge of his duty, and in the custody of the estate of the ward." The opinion then points out not merely failure to make timely reports, but also failure to invest funds, and the use of them by the guardian himself, and his refusal to be charged with the interest rate they might have earned.

In In re Guardianship of Anderson, supra, 208 Iowa 191, there had been "carelessness, neglect and malfeasance" resulting in loss to the estate. In the Benson case, supra, 213 Iowa 492, a reduction in compensation was made not merely on account of failure to make timely reports, but because accounts were not kept intelligibly and the trust not executed "in a business-like and efficient manner."

In re Estate of Moe, supra, 213 Iowa 95, 100, seems not at all in point. The executors, instead of closing the estate within three years, as was required by statute, permitted it to remain

open over six years. We held the burden was on them to show the nonprejudicial nature of the irregularity, but there was no denial of compensation on that account. The executors were allowed maximum statutory fees but no more, since there were no extraordinary services rendered.

Nor is In re Estate of Eschweiler, supra, 202 Iowa 259, in point favorable to appellants' thesis. It holds the burden was on an administratrix to establish that an irregular report was not prejudicial. It also holds, however, that irregular but nonfraudulent disbursements may be sustained on a showing that neither the insolvent estate nor the creditors was prejudiced.

No profit would result from a discussion of all cases cited. We resort instead to a general statement of the legal proposition which we deem accurate:

"Where the guardian * * * of a mental incompetent is guilty of neglect or affirmative breach of duty the court may deny him compensation, as where he fails in respect of his duties of reporting and accounting * * *. Not every breach of duty, however, will forfeit the award of compensation, and where there was neither bad faith nor resultant loss to the estate the court may allow compensation notwithstanding failure to account * * *." 44 C.J.S., Insane Persons, section 51b.

In 39 C.J.S., Guardian and Ward, section 164b, it is said:

"If, however, he [the guardian] has managed the estate in good faith and his neglect to file accounts has not operated to the injury of the ward, he will be entitled to commissions, the matter resting largely in the discretion of the court."

There is here no suggestion of bad faith or loss to the estate by reason of the failure of claimant, as guardian, to file reports during the long period of time from the filing of the inventory to the commencement of this proceeding. On the contrary, the evidence affirmatively shows good faith, good management of the property and excellent care of the wards. That there was no prior order of court authorizing what the mother, the sons and their sister had agreed on before the necessity for guardianship arose seems quite inconsequential as compared with the benefits to the mother while she lived and to the wards before and after her death.

The trial court, with admirable spirit and practical sense, has given effect to that part of the family arrangement that concerned the welfare of the wards, while denying specific performance of the part relating to claimant's compensation. As to the latter, we approve his method of determining the amount.

We find in appellants' brief and argument no criticism of the *amount* allowed for care and support of these elderly and helpless men or of the rental value charged against the guardian for use of the farm though these figures were somewhat in dispute in the testimony. Nor is there complaint as to the quality of care given the wards and their property.

The witnesses describe the arrangements made for the wards' comfort. One who said, "I have been going up there myself, and my father, before me, for 30 years," testified: "They [the wards] have a bed, radio, large davenport, oil burning heater, telephone, easy chairs, library table in their room; something characteristic of an old man's room. They listen to the radio and I have seen Tom listen to the telephone; I have never seen him use it. I have seen Mrs. Heckman put the food on the plates and put their knives and forks in their hands. They were practically incapable of feeding themselves."

Other witnesses gave similar testimony, some pointing out other particulars of the living arrangements, affectionate care on the part of claimant, and contentment on the part of the wards. There is no contradiction of this testimony.

Concerning the value and condition of the farm and its rental value there was some difference of opinion but no witness attempted to rate the land very high in quality. We find no reason for detailing the evidence in this respect.

The record negatives any mismanagement of the property but indicates it has been properly handled and maintained and improved.

II. Objectors argue the proof was insufficient to support allowance for expenditures. Claimant and the other appellees meet this with the proposition that the findings of fact have the effect of a jury verdict and will not be disturbed on appeal if supported by substantial evidence.

We doubt the validity of this proposition under the record. Of course, probate proceedings are not normally triable in equity, but claimant in asking for specific performance injected an equi-

table issue into the case. True, the trial court said, "we can take such testimony as can be presented and apply it on Count I as an equity matter and on Count II as a normal probate matter." Nevertheless in his findings of fact the trial judge says the *cause* was transferred to equity. The conduct of court and counsel throughout bears out this latter statement and it would be unfair for us now to treat the case as one at law merely because the equitable issue has been eliminated. The manner in which the record was made (acquiesced in by the parties) precludes such treatment here.

We have, accordingly, studied the record as for a de novo trial on appeal. The issue is purely one of fact. The expenditures allowed were for taxes, repairs and improvements on the property and clothing and medical attention for the wards. The total allowed for these items over the fifteen-year period was $14,-805.18.

The support for the amount of this allowance is found largely in the testimony of George Heckman, claimant's husband. His competency to testify is challenged under the "dead man's statute," section 622.4, Code, 1946. That statute would render him incompetent to testify to personal transactions or communications with the wards if they were "insane or lunatic" at the time of testifying.

The guardianship was granted under section 670.5, Code, 1946, which permits any person *"other than an idiot or lunatic"* to apply for appointment of a guardian of his person or property or both. The appointment constituted an adjudication that the wards were not idiots or lunatics. Anderson v. Schwitzer, 236 Iowa 765, 773, 20 N.W. 2d 67. The appointment did not necessarily imply insanity. See Dean v. Estate of Atwood, 221 Iowa 1388; 212 N.W. 371. We find no evidence of mental deterioration of either ward after 1933 though their physical disabilities, especially as to sight and hearing, undoubtedly increased. Objectors made no showing in support of their objections to the witness' competency.

When this testimony is considered the allowance for expenditures must be sustained. The evidence is too voluminous for analysis or summary within any reasonable bounds, and such analysis or summary would serve no useful legal purpose to

the profession. The number of exhibits ran over three hundred, most of them being checks and receipted bills and statements.

It is at this point the vice of failure to make timely reports becomes apparent. The court labors under the difficulty of ascertaining the purpose and propriety of expenditures long after the transactions, without entirely satisfactory evidence upon which to base a conclusion.

The reason for the situation is explained in the record. There was no bad faith. The parties all proceeded on the theory that the family understanding was effective. They were laymen unskilled in law.

A large part of the allowance for expenditures is composed of items for substantial repairs and improvements upon the farm. The total of these items is over $9500. There is no criticism of what was done in those respects. Undoubtedly there was much need of repairs and improvements for proper care of both wards and property.

Daniel O'Donnell testified the homestead residence (built in 1892) "was not modern; it had no furnace." He said further:

"I am afraid I can't enumerate all of the improvements which the Heckmans made on the place since they moved there * * *. When they moved there you could hardly get up the lane to the house. They fixed that so they could drive up there with a bus or a truck. They refloored the house with hard wood and enclosed the porches with glass for the two boys [wards] to sit on; the house has been painted twice, storm windows put on and screens and the entire east part of the basement was dug out and a new furnace installed with a stoker and a washing machine and electric equipment and they installed a telephone upstairs; also a bathtub and toilet and wash basin in one of the smaller bedrooms, to make it handier for the two boys to walk from their room to the toilet and back and an oil heater in their room and they have a radio.

"The combination feed house south of the old barn, a hog and hen house, has a cement floor and was built 4 or 5 years ago. The second house was put over there in recent years; it is about 150 or 180 feet north of the main house. There has been a lot of fencing done; they put an electric pump down at this well and a windmill and a pipe has been laid from the tank on the northwest corner of the cow lot; and they laid pipe from there to both

houses and to the barn for the water; they bought a manure spreader and put the manure out and I think put some lime on the land. Part of the time the Heckmans rented an 80 from Mrs. Betts, and they own 40 acres east of Granger, which was mostly pasture and they also farmed the Whitehouse 80."

We refrain from quotations from Mr. Heckman's testimony. The details of expenditures are set out on Exhibit B, a schedule prepared in part by Loren Cartwright, a farm manager, assisted by claimant's husband. The items for 1936 and subsequent years are supported (except in a few instances) by checks or other vouchers. The exhibit shows a total of taxes (1933-1948) $3-161.61, insurance $480.16 and clothing and doctor bills for wards, $1670.

We shall not further burden the printed page. The record shows the farm (not too good at best) was run down and the building in poor condition when claimant and her husband moved on. We are persuaded the expenditures were made and were for the benefit of the wards and their property. The evidence shows they were competent to form some judgment and were satisfied with their treatment and the management of the farm. The guardian ad litem and special guardian, both appointed to protect the wards' interests, approve the decision. The appeal is by objectors who seem to have been content to allow claimant and her husband to carry the very real burden of care of wards and property throughout the years.

The decision of the trial court is affirmed with faith that this claimant, as guardian of her ward's person, will meet what the trial judge appropriately called "a strong moral obligation * * * to continue her care and support of" the remaining ward "during the balance of his natural life."—Affirmed.

All JUSTICES concur.