IN RE GUARDIANSHIP OF MIKEL AND HELENA ANDERSON.

No. 48979.

(Reported in 78 N.W.2d 788)

1294

Hart & Hart, of Waukon, for appellant.

Haehlen & Morrow, of Waukon, for appellee.

Smith, J.—On May 31, 1950, Mikel Anderson (then 84) and wife Helena (93) acting under Code section 670.5, Iowa Code, 1946, had their grandson, Milton J. Anderson, appointed their guardian. They owned 160 acres of land (the W½ SE¼ and the E½ SW¼).

The "First Report", filed January 31, 1951, stated the proceeding was started "for the sole purpose of assisting the wards with their affairs" and that the guardian had not taken charge of any of the personal property, but "has acted solely in an advisory capacity" and "has let the wards handle their own money and will do so as long as they are capable."

Helena died January 11, 1953, and Mikel, April 17, 1954. There have since been filed a Final Report, June 2, 1954; Objections by a daughter of the wards, June 22, 1954; Amendment to Final Report, September 17, 1954; Amendment to Objections, September 27, 1954; Reply, October 6, 1954; Substituted and Amended Final Report, December 14, 1954; Motion attacking Substituted and Amended Report (in two Divisions: to strike and for more specific statement) December 20, 1954; Amendment to Final Report, January 4, 1955; Motion attacking same, January 7, 1955; and finally, Objections (to Substituted and Amended Final Report * * * and the Amendment filed January 4, 1955) filed March 15, 1955.

The trial court ruled promptly on the motions, sustaining the motion for more specific statement and overruling all others.

We have enumerated the many steps in the proceedings as showing the difficulty of accounting when no accounts were

kept and where the guardian has not even personally carried on much of the business for which he attempts to account.

We are not disposed to be too critical of the parties themselves. It is abundantly clear the guardianship was handled as the wards themselves desired. Under the record (without dispute) they were not mentally incompetent nor seriously weak; their trouble was physical inability, and the guardian and most members of the family apparently understood the situation. There was not much if anything to do for the wards that was not done according to their wishes.

We in Iowa are accustomed to think of 160 acres of land as a substantial farm. But the record here fairly shows (as the trial court found) that "this is an exceedingly poor farm, very rough with less than half of it capable of being tilled."

There were two sets of buildings, unconnected by any road, "very old and in very poor condition." The attorney who drew the papers and handled the case until about a week before trial testifies: "The farm has very poor soil, little of open land that could be cultivated. There is a ridge on the east 80, might be around 25 acres open, 12 acres that could be cultivated, probably the same amount on the west 80, maybe a little more open land. Land very rough and rolling and the rest in timber."

He also testifies: the house on the east 80 "is log with iron sheeting. The granary is about the best building on the place, about 20 by 24. Barn in bad shape. Also a woodshed and old corncrib. On the west 80 is a house, think it is frame, quite old, was not in it. Log barn, no stanchions or mangers, could keep cattle in it."

The trial court found that for many years the wards had permitted their son Marcus (the guardian's father) to live on the northwest forty and to have the use of the same without any arrangement for rentals. The court found that the fields were largely narrow strips of land that had not been fertilized for many years, and for that reason were not capable of producing anywhere near average crops.

The wards "had a team and a few cows, but were unable to care for the livestock or to work the land, and they had no means of transportation to town for the purpose of getting supplies

or going to a doctor's office." All these and other findings are amply supported by the record. Clearly the age and condition of the wards did not justify any long-range plan to improve the property.

Much of the burden of caring for the wards and estate had formerly been carried for some time by Carl Anderson, a son of the wards, whose death in 1950 probably precipitated the guardianship. He and they occupied the set of buildings on the east 80 together and farmed part of the land. Milton's father, Marcus, with his family (including the guardian's brother Orlando) occupied the other part.

Orlando testifies that after his Uncle Carl died, the manure, mostly for two years, was still in the barn, and two doors of the cow barn could not be opened. It fairly appears that by arrangement with the old couple matters were otherwise carried on much as before Carl died. Direct testimony of the fact other than the attorney's is hardly necessary. The guardian lived in town.

Besides Marcus, Carl and the objector (Mrs. Louis Larson) the wards had three other children whose residences are not shown and who took no part in the proceedings. The trial court overruled the objections to and approved the final report but denied guardian's compensation, holding "the big bulk of the work of caring for the wards and taking care of their personal needs was done by Orlando Anderson, who is making no claim."

The objector has appealed.

I. The case is not triable here de novo. In re Guardianship of Damon, 238 Iowa 570, 580, 28 N.W. 2d 48. And the strict rules of pleading do not govern. In re Estate of Onstot, 224 Iowa 520, 277 N.W. 563; Soppe v. Soppe, 232 Iowa 1293, 8 N.W.2d 243.

Also it is established there is no basic difference between the powers and duties of a guardian appointed upon the ward's own application and those of one appointed in proceedings instituted by another. Neidermyer v. Neidermyer, 237 Iowa 685, 687, 22 N.W.2d 346; Anderson v. Schwitzer, 236 Iowa 765, 20 N.W.2d 67; In re Guardianship of Kappel, 242 Iowa 1021, 1027, 47 N.W.2d 825.

Of course no two guardians have exactly similar prob-

lems. The circumstances differ. And the fact that a ward is alert mentally and has a guardian appointed because of physical inability to manage his own problems creates a situation differing from the more common one where the ward is mentally incompetent. But the powers and duties of the guardian are essentially the same. The wishes of the ward do not change them. They are entitled to consideration but do not excuse failure to keep accounts and report from time to time and the securing of approval of court in major matters. We see no reason why a guardian may not, and should not within reasonable limits, observe the wishes of an elderly but mentally competent ward, and at the same time follow the orderly rules of procedure.

We have held however that failure to secure prior authority and to file reports will not defeat a guardian's right to recover for services and expenditures in the absence of a showing of bad faith or loss to the estate: "That there was no prior order of court authorizing what the mother, the sons [wards] and their sister had agreed on before the necessity for guardianship arose seems quite inconsequential as compared with the benefits to the mother while she lived and to the wards before and after her death." In re Guardianship of O'Donnell, 241 Iowa 77, 83, 40 N.W.2d 35, 39. And where there was no showing of loss to the guardianship we have refused to penalize the guardian for assisting a third party in a transaction with him. In re Guardianship of Ridpath, 231 Iowa 977, 983, 2 N.W.2d 651.

It was pertinently suggested here in oral argument that the resort to guardianship was probably ill-advised and that a power of attorney or some form of agency arrangement might have been more appropriate to the situation. But that affords no excuse for failure to observe the procedure prescribed by law, designed to avoid loss to the estate or injury to the ward.

It may be observed here the record does not show whether the guardianship was of the person or property. We proceed on the theory both were included. See Burger v. Frakes, 67 Iowa 460, 462, 23 N.W. 746, 25 N.W. 735. The matter is not too important however under the record.

II. A careful reading of the record confirms the trial

court's conclusion that the receipts and expenditures made by the wards were substantially accounted for, except a balance of less than $1000 "which the evidence shows probably all went for the purchase of food and the family expenses. * * * that every cent of the wards' money in the bank at Waukon has been satisfactorily accounted for, and that neither the guardian nor any other person than the wards ever received any part of the same."

The court analyzes the testimony as to "rental value" and "crop yields" and says "the guardian should not be charged with any additional rentals for the farm during the period of the guardianship."

There is sufficient evidence to support the court's findings and we agree with the conclusion. The objector gave practically no testimony and produced but one witness who only testified as to rental value. His testimony at most created a factual issue upon which the trial court's decision is final.

■ III. There was much controversy over the competency of the guardian, his attorney, and his brother Orlando, as witnesses, principally under the Dead Man statute. The trial court withheld ruling on those objections, but at the close of the trial ruled:

"The Court finds that the guardian Milton Anderson is an incompetent witness under (Code) section 622.4, and that his testimony with reference to personal transactions with the wards, who are now both deceased, is therefore incompetent.

"Much of the testimony of Orlando Anderson is likewise incompetent for the same reason, although his evidence with reference to the description of the farm and the crops raised * * * and * * * the livestock and the working of the farm are competent."

The same qualification should apply to the guardian's testimony, much of which did not relate to any personal transaction.

■ The court held the attorney who started the guardianship proceedings to be competent as a witness and that his affidavit as to reasonable value of legal services is not a claim or debt within the purview of the statute "but rather, a claim for compensation to be fixed by the court", citing Buckley v. Eben-

dorf, 204 Iowa 896, 900, 216 N.W. 20, 21. No case cited by appellant holds otherwise. In the Buckley v. Ebendorf case the position of the lawyer-witness was substantially as here. We said: "He is not interested in the outcome of the suit so as to make him an incompetent witness."

IV. As we have already pointed out the manner in which the guardianship was conducted added much to the difficulty of accounting. The difficulty was not lessened by the guardian's handicap as a witness under the dead man statute. We are thoroughly convinced however there is competent testimony here to require an affirmance.

We have considered other procedural criticisms and have concluded there was no prejudicial error. We agree with the ruling allowing attorney fees and guardian expense but denying guardian fees.—Affirmed.

All JUSTICES concur.