2013 VT 86



CitiFinancial, Inc. v. Balch
(2012-118)

 

2013 VT 86

 

[Filed 04-Oct-2013]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 2013 VT 86
 
  


 No. 2012-118
 
  


 CitiFinancial, Inc.
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 Superior Court, Rutland Unit,
 
 
  
 
 
 Civil Division
 
 
  
 
 
  
 
 
 Judith Balch, Special
 Administratrix of the 
 Estate of Theodore Ballard 
 
 
 November Term, 2012
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Mary
 Miles Teachout, J.
 
 
  
 
 Andrew H. Montroll and Amber L. Doucette of Bendett and
McHugh, P.C., Burlington, for

  Plaintiff-Appellant.

 

Judith Balch, Pro Se, Castleton, Defendant-Appellee.

 

 

PRESENT:  Reiber, C.J., Dooley, Skoglund, Burgess and
Robinson, JJ.

 

 

¶ 1.            
ROBINSON, J.   Plaintiff CitiFinancial, Inc. appeals
from the superior court’s order granting summary judgment to defendant, the
Estate of Theodore Ballard, on its foreclosure complaint.  CitiFinancial
argues that Ballard, who was under a voluntary guardianship, was bound by a
mortgage deed and promissory note that he and his guardian co-signed, and that
the trial court erred in concluding otherwise.  We affirm in part and
reverse and remand in part.  

I.

¶ 2.            
We begin with an overview of the guardianship process.  Vermont law
has provided for voluntary guardianships since 1912.  Initially, such guardianships
were available for those individuals over eighteen who deemed themselves
“unfitted by reason of infirmity, age or other mental or physical disability,
for the prudent management of [their] affairs.”  14 V.S.A. § 2671
(1974).  Prior to 1979, the law did not list the potential powers that a
guardian could possess.  Instead, all guardians in all types of adult
guardianships had the same powers: “the possession and management” of their
ward’s estates, as well as “the care and custody” of the ward.  Id.
§ 2692 (1974); see also id. § 2799 (providing that guardian
could: “receive, sue for and recover, debts and demands due” to ward; “maintain
and defend actions or suits,” “settle accounts, demands, claims and actions at
law or in equity by or against his ward”).  

¶ 3.            
Under this statutory scheme, guardians in all types of adult
guardianships were required to give notice that their ward’s future contracts
and transfers of real or personal property would be held void.  Id.
§ 2690.  Guardians were also required, as they are today, to obtain a
license from the probate court to sell or mortgage the ward’s real estate, see id.
§§ 2201, 2881-2891, but not to sell the ward’s personal property.  Id.
§ 2798.  

¶ 4.            
The Legislature made numerous changes to the guardianship laws in 1979,
essentially adopting the approach in place today.  Section 2671 made
voluntary guardianships available for any individual, eighteen years or older,
who “desires assistance with the management of his or her affairs.”  1979,
No. 76, § 3; see also 14 V.S.A. § 2671(a) (2012) (same).  As
part of this overhaul of the guardianship statutes, the Legislature delineated
specific powers that a guardian could possess in 14 V.S.A. § 3069. 
In voluntary guardianship cases, petitioners themselves specify which powers
they wish the guardian to exercise from the list found in § 3069, while
courts in involuntary guardianship cases choose which powers from § 3069
are appropriate and necessary.  See 1979, No. 76, § 15; see also 14
V.S.A. §§ 2671(b)(2), 3069.  

¶ 5.            
At the time of the guardianship petition in this case, § 3069
identified the following guardianship powers: the power to: (1) exercise
general supervision over the ward; (2) approve or withhold approval of any contract,
except for necessaries, which the ward wishes to make; (3) approve or withhold
approval of the ward’s request to sell or in any way encumber his personal or
real property; (4) exercise general supervision over the income and resources
of the ward; (5) consent to surgery or other medical procedures subject to
statutory or constitutional limitations; and (6) receive, sue for, and recover
debts and demands due to the ward; maintain and defend actions or suits for the
recovery or protection of the ward’s person or property; settle accounts,
demands, claims and actions at law or in equity by or against the ward, and
compromise, release and discharge the same on such terms as he deems just and
beneficial to the ward.  1979, No. 76, § 15.  These are essentially
the same powers identified in the current statute.  See 14 V.S.A.
§ 3069(c)(1)-(6).  

¶ 6.            
As indicated above, in involuntary guardianship cases, the court could
appoint a “limited guardian,” who could exercise only specified powers, or a
“total guardian,” who could exercise all of the powers of guardianship. 
1979, No. 76, § 15; see also 14 V.S.A. § 3069(d)(1) (stating, under
current law, that when guardian has been granted some but not all guardianship
powers, guardianship is identified as a “limited guardianship” and guardian
identified as a “limited guardian”).  The law specifically provided that
persons for whom a limited guardian was appointed retained all legal and civil
rights except those that had been specifically granted to the limited guardian
by the probate court.  Id.; see also 14 V.S.A. § 3069(d)(2)
(stating that, under current law, a person under limited guardianship retains
all powers identified in § 3069(c) except those that have been
specifically granted to limited guardian). 

¶ 7.            
As of 1979, only guardians of spendthrifts were required to provide
notice that their ward’s “contracts, gifts, sales or transfers of real or
personal estate made after the guardian’s appointment would be considered
void.”  See 1979, No. 76, § 18.  This was presumably done in
recognition that, in all cases other than spendthrift guardianships, a ward
might retain certain rights, such as the right to contract or convey real
property.  Compare 1979, No. 76, § 19 (guardians of spendthrifts
shall have the possession and management of the estates of their wards), with id.
§ 15 (delineating powers of guardian and recognizing that in limited
guardianships, ward retains “all legal and civil rights except those which have
been specifically granted to the limited guardian by the court”).

¶ 8.            
As stated above, guardians must obtain a license from the probate court
to mortgage or sell a ward’s real property.  See 14 V.S.A.
§ 3069(c)(5) (stating that guardian’s power to approve or withhold
approval of sale or encumbrance of real property of person under guardianship
is subject to the real estate licensing provisions set forth in 14 V.S.A.
§§ 2881-2891[1]);
id. §§ 2201-2202 (setting forth requirements for mortgage or lease
of ward’s property).  No license is required to sell a ward’s personal
property unless the proceeds of such sale are to be invested in real
estate.  Id. § 2798 (stating that guardian may sell ward’s
personal estate when necessary or for the ward’s interest, and may use funds to
pay necessary expenses of ward’s maintenance and education); id.
§ 2803 (stating that on motion of guardian or other specified individuals,
and following notice and hearing, probate division may authorize or require
guardian to sell and transfer stock or other personal estate of ward, collect
demands and invest in real estate the proceeds and moneys in guardian’s hands
if court deems it beneficial to ward); see also In re Estate of Collette,
122 Vt. 231, 235, 167 A.2d 361, 363 (1961) (“A guardian is not required to
obtain a license to sell from the probate court before selling personal estate
of his ward unless the proceeds of such sale are to be invested in real
estate.”).  

¶ 9.            
This approach appears consistent with the general rule in other
states.  See, e.g., H.D.W., “Power of Guardian to Sell Ward’s Property
without Order of Court,” 108 A.L.R. 936, 937, 944 (1937) (“By the great weight
of authority, a guardian, unless restrained from doing so by statute, has the
power to sell his ward’s personal property without an order from the
court. . . .  It is a general rule that a guardian has no
authority to sell real estate of his ward without an order of court, in the absence
of a statute expressly or by implication conferring the power or authority
otherwise conferred upon him, as by will.”).  

¶ 10.        
Under Vermont law, a license to sell a part or all of the lands of a
ward or the interest of such wards in real estate, vested or contingent, will
be granted only if the court finds that: (1) the ward’s personal estate is
insufficient to pay the expenses of maintaining the ward and his or her family,
or of educating a minor ward as his or her circumstances require; (2) the
ward’s personal estate is insufficient to pay his or her debts contracted
before or after the appointment of his or her guardian; or (3) it appears to
the court conducive to the ward’s interest to sell the real estate, or an
interest vested or contingent therein, and put the proceeds at interest or
invest it in stocks or in real estate.  14 V.S.A. § 2881. 
Procedural requirements for granting such a license include notice and a
hearing, at which the guardian must produce proof of the value of the estate to
be sold, the interest of the ward therein, and of the necessity of sale; the
guardian may also be required to post a bond.  Id.
§ 2882(1)-(3).[2] 


¶ 11.        
Cross-referenced in the provision governing the sale of real estate is
14 V.S.A. § 2201, which governs the execution of mortgages and leases by
guardians and other fiduciaries such as executors, administrators, and
trustees.  The law provides that, “[i]f on motion and after notice and
hearing it appears to be for the benefit of the estate,” the probate court “may
authorize a fiduciary to mortgage any of the real estate or to mortgage, pledge
or assign any of the personalty of the estate” for certain specified
purposes.  Id.  These purposes include the following: “to
prevent a sacrifice of the estate; to make repairs and improvements upon the
estate; to pay debts, legacies or charges of administration; to pay an existing
mortgage, lien or tax on the estate, or to support a ward.”  Id. 


¶ 12.        
In his or her motion, the guardian must describe “the property to be
mortgaged, pledged or assigned, the amount of money necessary to be raised, the
nature and amount of the obligation to be secured and the purpose for which the
money or security is required.”  Id. § 2202.  If the
request is approved, the probate court will: 

 

fix the amount for which the mortgage,
pledge or assignment may be given, the terms thereof and the rate of interest
which may be paid thereon, and the court may order the whole or any part of the
money secured by the mortgage to be paid from time to time out of the income of
the property mortgaged.

 

Id.  As these
regulations reflect, “[t]he legislative power has, with great care, guarded the
rights of wards in their real estate.”  Doty, 55 Vt. at 283; see
also Burnell v. Malony, 36 Vt. 636, 638 (1864) (observing that
regulations governing the issuance of licenses to sell reflect the “jealous
care” with which the rights of wards are guarded).

¶ 13.        
Notwithstanding the changes made in 1979, or perhaps because of them,
Title 14 is confusing in many respects and it contains provisions that are
potentially contradictory.  The 1979 amendments and additions to the law
governing guardianships do not appear to have addressed all statutes pertaining
to the powers and duties of guardians.  Older statutes that remain compete
with the more recent amendments.  The result is a hodgepodge.  For
example, 14 V.S.A. § 2798 remains essentially as it was in 1797, and
provides that a guardian may sell a ward’s personal estate when necessary or
for the ward’s interest, and use funds to pay necessary expenses of the ward’s
maintenance and education.  This statute now seems to be encompassed by 14
V.S.A. § 3069(c)(3), which gives a guardian the power to “liquidate
personal property for the benefit of the person under guardianship.”  

¶ 14.        
In a similar vein, 14 V.S.A. § 2801, which is essentially unchanged
since 1839, allows a guardian to discharge a mortgage when the proper sum is
paid to the guardian, release any claim of his ward as mortgagee, and “give the
consent of his ward to the sale of real estate when such consent is required by
law.”  This would appear to be a power that a person under a voluntary
guardianship might want to give a guardian, but then again, the person might
not; if a person seeking voluntary guardianship does not request that the
guardian have such power, and the court does not incorporate the power into an
order, this provision would seem a usurpation of the ward’s retained
rights.  

¶ 15.        
We note, moreover, that the provision governing licenses to mortgage a
ward’s real estate, while cross-referenced in the “guardianship” chapter of
Title 14, is contained in a different chapter of Title 14.  This could
lead to it being overlooked, as it was by the court and the parties in this
case.  Additionally, in describing the powers of a guardian, 14 V.S.A.
§ 3069(c)(5) provides that a guardian’s power to approve or withhold
approval of sale or “encumbrance” of real property of a person under
guardianship is subject to the real estate licensing provisions set forth in 14
V.S.A. §§ 2881-2891.  The reference to an “encumbrance” is somewhat
confusing in that an encumbrance of property involving a mortgage is presumably
covered by 14 V.S.A. § 2201 rather than § 2881.  While there is
some overlap in the court findings necessary to warrant a mortgage and a sale,
they are not the same.  Compare id. § 2201 (mortgage may be
authorized “to prevent a sacrifice of the estate; to make repairs and
improvements upon the estate; to pay debts, legacies or charges of
administration; to pay an existing mortgage, lien or tax on the estate, or to
support a ward”), with id. § 2881 (sale of land or interest in land
may be authorized when: ward’s personal estate is “insufficient to pay expenses
of maintaining the ward and his or her family, or of educating a minor ward as
his or her circumstances require”; when ward’s personal estate is “insufficient
to pay his or her debts contracted before or after the appointment of his or
her guardian”; or “when it appears to the court conducive to the interest of
the ward to sell the real estate, or an interest vested or contingent therein,
and put the proceeds at interest or invest it in stocks or in real estate”). 
While these issues do not affect the resolution of this case, they do highlight
the need for legislative clarification of the laws governing guardianships.  

II.

¶ 16.        
With this background in mind, we turn to the facts of this case. 
Ballard filed a petition for a voluntary guardianship in May 2005. 
Ballard was seventy-one years old at the time and apparently could not
read.  In June 2005, following a hearing, the Fair Haven Probate Court
appointed Ballard’s niece, Leala Bell, as Ballard’s guardian.  Bell was
granted powers of guardianship that included the power to approve or withhold
approval of any contract, except for necessaries, which the ward wished to
make, and the power to approve or withhold approval of the ward’s request to
sell or in any way encumber his personal or real property.

¶ 17.        
On June 30, 2008, in the context of a refinance of the mortgage on
Ballard’s property, Ballard and Bell executed a promissory note in
CitiFinancial’s favor for $102,670.28, with interest accruing at 12.16%.[3]  Bell signed the promissory note as
a “borrower”; she did not expressly indicate that she was signing as Ballard’s
guardian or that her signature indicated only her “approval” of Ballard’s
action.  The loan was secured by a mortgage on Ballard’s real
property.  The mortgage deed granted and conveyed Ballard’s property to
CitiFinancial, including the power to sell the property.  Ballard signed
the mortgage deed but Bell did not.  There was no showing that the probate
court licensed the mortgage.  

¶ 18.        
Not long thereafter, CitiFinancial sought to foreclose on the
property.  In August 2009, Bell requested that her role as guardian be
terminated.  Following a hearing, the probate court terminated her appointment
and appointed Judith Balch and Lisa Kemp as co-guardians.  In October
2009, following the dismissal of a prior complaint due to inadequate service,
CitiFinancial sued Ballard.[4] 
This complaint was also dismissed after CitiFinancial failed to comply with a
court order to correct several errors in its motion for summary judgment. 
In June 2010, CitiFinancial filed the instant foreclosure complaint against
Ballard.[5] 
CitiFinancial alleged that Ballard had failed to make the payments called for
under the note and mortgage, and thereby breached these agreements.  

¶ 19.        
Ballard moved for summary judgment, arguing in relevant part that he
lacked the legal capacity to execute a mortgage deed and promissory note while
he was under guardianship.  Ballard also asserted that no license had been
granted with respect to any mortgage on his property.  Ballard argued that
a Motion for License to Sell Real Estate, which required a hearing before the
probate court, served to protect the ward’s interest, and in this case, it did
not appear that the loan funds had been used for the ward’s benefit. 
CitiFinancial opposed the motion, arguing that Ballard failed to show that he
lacked the ability to contract or that he did not agree to the promissory note
and mortgage.  

¶ 20.        
In a February 2012 decision and order, the court granted summary
judgment to Ballard.  It found that the guardian here had total powers
over Ballard’s affairs with no powers reserved for the ward.  Because the
probate court did not approve the note and mortgage and Ballard was under a
valid guardianship at the time they were executed, they were not enforceable
against Ballard or his estate.  While the guardian might be liable to
CitiFinancial, the court explained, Ballard’s estate was not, nor was its real
estate subject to CitiFinancial’s mortgage.  Neither the court nor any of
the parties referred to 14 V.S.A. § 2201, which specifically addresses the
mortgage of a ward’s property.  Instead, the court relied on 14 V.S.A.
§ 2881, which addresses the sale of a ward’s land or of the ward’s
interest in land.  CitiFinancial appealed from the court’s order.  

¶ 21.        
We review a grant of summary judgment using the same standard as the
trial court.  Richart v. Jackson, 171 Vt. 94, 97, 758 A.2d 319, 321
(2000).  Summary judgment is appropriate when, taking all allegations made
by the nonmoving party as true, there are no genuine issues of material fact
and the movant is entitled to judgment as a matter of law.  Id.;
V.R.C.P. 56(a).   

¶ 22.        
CitiFinancial argues that the promissory note and mortgage deed are
valid and enforceable against Ballard.  According to CitiFinancial, after
his guardian was appointed, Ballard could continue to execute contracts or
encumber his own property as long as he had his guardian’s approval.
 CitiFinancial asserts that Bell’s signature as a co-borrower on the
promissory note and settlement statement evidence her “approval” of Ballard’s
execution of the promissory note, and that Bell approved of Ballard’s execution
of the mortgage deed because the execution of the promissory note and the
mortgage deed, along with the other closing documents, were all part of the
same transaction.  

¶ 23.        
As to the statute governing the sale of a ward’s real estate, 14 V.S.A.
§ 2887, CitiFinancial maintains that a license to sell was not required
because this was “simply a contract to borrow and repay certain funds” and
because Ballard’s property was not actually sold.  Even if this statute
applied to the granting of mortgages, CitiFinancial asserts that it is limited
to those situations where it is the guardian who seeks to sell the
property.  According to CitiFinancial, this law does not restrict a ward
from selling his or her own property.  CitiFinancial does not discuss the
law governing licenses to mortgage a ward’s property, 14 V.S.A.
§ 2201.  

A.

¶ 24.        
First we consider whether the ward was required to obtain his guardian’s
approval of the note and mortgage and, if so, whether Bell’s signature on the
note as a cosigner sufficiently evidenced such approval.  CitiFinancial
appears to concede that, pursuant to the terms of the guardianship here, the
ward was required to obtain his guardian’s approval to execute the promissory
note and the mortgage deed.  Obviously, the ward could have retained the
power to enter into contracts (other than for necessaries, which he did retain)
or the power to sell or encumber his real property.  Instead, he
specifically requested that his ability to exercise these powers be subject to
approval of his guardian, and the probate court issued an order to this
effect.  Given that the guardian has both the power to approve and to
“withhold approval” of the ward’s proposed transactions, the ward cannot act
independently in these matters.  If the ward could continue to act
unilaterally, the guardian would be unable to fulfill his or her statutory
obligation to manage the ward’s estate “frugally and without waste and in a
manner most beneficial to the ward,” 14 V.S.A. § 2797, and the probate
division’s supervisory function would be impeded.  A competent ward who
wishes to retain the power to convey the ward’s property unilaterally can do so
under the guardianship laws.  But once the ward has conveyed this power to
the guardian, he or she must modify the terms of the guardianship in order to
recover that right.  

¶ 25.        
There is no dispute that Bell signed the promissory note below Ballard on
a line bearing the pre-printed designation “Borrower,” with no reference to her
status as Ballard’s guardian.  The question is whether, on the basis of
this fact, the court could conclude that Bell approved his entering into this
contract.  A factfinder could easily infer that Bell’s signature reflected
her assent to the loan.  It is hard to imagine any other plausible
inference.  The question of the “capacity” in which she signed the
document may very well be critical to an assessment of Bell’s own personal
liability on the note, but is not determinative of the question of whether she
approved his entering into the contract.[6] 
The guardianship order in this case and the underlying statute required Bell’s
approval of Ballard’s execution of the contract; they do not prescribe any
particular requirements for documenting that approval, and do not require her
to cosign agreements executed by Ballard with her approval, let alone to cosign
in a particular “capacity.”  14 V.S.A. § 3069.  The statute
simply requires her approval.

¶ 26.        
Ballard’s argument relies on the notion that Bell participated in the
transaction with CitiFinancial, subjected herself to personal liability as a
cosigner of the note, signed the settlement statement as well as the promissory
note, but did not actually approve Ballard’s signing of the note.  This
narrative is not compelled by the undisputed facts; in fact, it is hard to
square with the record.

B.

¶ 27.        
We next consider whether the absence of a license from the probate court
affects the validity of the note and mortgage.  The law plainly requires
probate court approval for the issuance of a mortgage deed.  See 14 V.S.A.
§§ 2201-2202.  A guardian must seek such approval by motion, id.
§ 2202, and the court must find that the mortgage will satisfy one of the
specifically enumerated statutory purposes.  It is undisputed that the
guardian failed to comply with this statute here.  The mortgage deed is
therefore ineffective.  See, e.g., Slafter v. Savage, 89 Vt. 352,
355, 95 A. 790, 791 (1915) (“A guardian can only dispose of the real estate of
his ward by proceeding in accordance with statutory
provisions . . . .”).  

¶ 28.        
We reject CitiFinancial’s suggestion that the licensing requirements do
not apply when a ward subject to a voluntary guardianship, as opposed to
the guardian, seeks to sell property.  This makes no sense in cases where,
as here, the ward has essentially ceded the power to approve a sale or
encumbrance of real property to a guardian.  Having done so, the ward
cannot then act unilaterally.  CitiFinancial cites no case where a court
has found that a ward in a voluntary guardianship can continue to convey or
encumber property unilaterally once the ward has assigned such power to a
guardian.  In fact, there is authority to the contrary.  In Bryan
v. Century National Bank, 498 So. 2d 868 (1986), the Florida Supreme Court
concluded that where a competent ward had surrendered control of her property
to a voluntary guardian, the ward could no longer unilaterally transfer that
property.  In reaching its conclusion, the court recognized the
significant difference between voluntary and involuntary guardianships—the
former available only to competent individuals.  In recognition of this
difference, it found that the law allowed wards in voluntary guardianships to
determine what property would be subject to a guardian’s control.  The
property so included was subject to court protection and court supervision, and
the ward, although mentally competent, could no longer freely deal with such
property.  Id. at 871.  The court emphasized that wards were
free at the outset to exclude certain property from the guardian’s oversight,
and they remained free at any time to modify or terminate the guardianship and
dispose of their property as they saw fit.  As it explained, the
guardianship was for the ward’s convenience, and the guardian’s control over
such property continued only so long as the ward desired.  Id. at
871-72.  

¶ 29.        
An Ohio court reached an analogous conclusion in In re Tillman,
137 N.E.2d 172 (Ohio Prob. Ct. 1956), although the probate laws at issue differ
somewhat from Vermont law.  In that case, the court held that a mentally
competent individual who agreed to a guardianship did not retain dominion over
her property and could not direct the expenditures of her own money and the
disposition of her own property.  The court found that, other than the
appointment process, its probate laws made no distinction between a guardianship
for a mentally incompetent person and a person rendered incompetent by reason
of physical disability or infirmity.  Id. at 174.  Given this,
the court found that it would be “highly improper” for the court to create such
a distinction “by judicial fiat.”  Id.

¶ 30.        
The court in Tillman found that when the ward consented to the
guardianship, “she waived her constitutional rights to control the disposition
of her own property and consented to having her property administered by a
guardian who was subject to the rules of law and the supervision of the probate
court.”  Id. at 175.  It emphasized that the ward did not have
to so consent, and at any time during the guardianship, she could have
requested its termination.  The court concluded that to allow the ward to
act unilaterally would make the guardian “an agent of [the] ward, rather than
an officer of the Court, and to substitute the judgment of the ward for the
judgment of a court of law.”  Id.  It rejected the notion that
the “services of a court of law” could “be enlisted for rubber stamp purposes.”
 Id.  

¶ 31.        
CitiFinancial cites no case law in support of its position and we find
none.  We similarly find nothing in our statutes to support
CitiFinancial’s position.  While our statutes emphasize cooperation
between guardian and ward in all types of guardianships, our Legislature has
not defined a different set of powers and duties for guardians in voluntary
guardianships as opposed to involuntary guardianships.  The primary difference
between the guardianships is the method by which the guardian is appointed and
the competent ward’s ability to choose which powers the guardian will
exercise.  See, e.g., Bryan, 498 So. 2d at 874 (Boyd, J.,
dissenting) (“The difference between voluntary and involuntary guardianships is
not in the responsibilities or duties of the guardian once appointed, but
rather in the process of the appointment of the guardian.”); see also In re
Guardianship of Anderson, 78 N.W.2d 788, 791 (Iowa 1956) (finding no basic
difference under Iowa law between powers and duties of voluntary and
involuntary guardians).  

¶ 32.        
Nor does the plain language of the relevant licensing statutes
distinguish between guardians in voluntary or involuntary guardianships. 
Instead, the statutes refer generally to a “guardians” or “fiduciaries,” which
include guardians.  See 14 V.S.A. §§ 2201, 2881.  As stated
above, guardians in both types of guardianships derive their powers from the
same statute.  See id. § 3069; id. § 2671(b)(2)
(person seeking voluntary guardianship shall specify which of the powers of the
guardian as set forth in § 3069 he or she requests to be exercised by the
guardian).  In fact, 14 V.S.A. § 3069(c)(5) now explicitly states
that a guardian’s power to approve or withhold approval of the sale or
encumbrance of a ward’s real property is subject to the licensing requirements
set forth in 14 V.S.A. §§ 2881-2891, although this has long been required
under our law.  See, e.g., Doty, 55 Vt. at 283.

¶ 33.        
The law governing mortgages by guardians similarly does not limit its
application to involuntary guardianship cases.  Instead, it applies to any
fiduciary who seeks to mortgage his or her ward’s property.  See Wright
v. Atwood, 195 P. 625, 627 (Idaho 1921) (“The courts quite generally agree
that in the absence of [a] statute authorizing such proceedings a guardian has
no power to mortgage the ward’s real estate.”).  As the Wright
court observed, “If the power to mortgage [a] ward’s estate has been given to a
guardian, it must be plainly and unequivocally
conferred, . . . and it is limited to the purpose expressed
in the statute, and must be exercised in the exact manner prescribed
therein.”  Id.  The language of our statutes is plain and
their purpose is clear.  We must enforce the statutes as written.  Rochon
v. State, 2004 VT 77, ¶ 8, 177 Vt. 144, 862 A.2d 801; see also Brennan
v. Town of Colchester, 169 Vt. 175, 177, 730 A.2d 601, 603 (1999) (“We will
not read an implied condition into a statute unless it is necessary in order to
make the statute effective.” (emphasis omitted) (quotation omitted)).  For
these reasons, we conclude that the mortgage deed executed by Ballard is
ineffective.

¶ 34.        
We reach a different conclusion with respect to the promissory
note.  Although the mortgage deed purportedly executed by Ballard and the
promissory note secured by that deed were executed as part of the same overall
transaction, the two documents created distinct legal obligations.  The
promissory note purportedly gave rise to Ballard’s personal liability for
repayment of the loan.  The mortgage purportedly provided security to
CitiFinancial and a means for collecting at least part of the note against the
property in the event of a default.  Pomfret Farms Ltd. P’ship v.
Pomfret Assocs., 174 Vt. 280, 283, 811 A.2d 655, 658 (2002) (“The mortgage
and the note are distinct, however, and, while the mortgage does not impose any
personal liability on the defendant, a personal obligation is imposed on the
underlying note.”); Lafarr v. Scribner, 150 Vt. 159, 161, 549 A.2d 651,
652 (1988) (“Neither the mortgage nor the judgment impose any personal
liability on defendants.  The only personal obligation of defendants is on
the underlying note.”).  

¶ 35.        
The authority specifically granted to Bell by the guardianship order
included the power to exercise general supervision over Ballard; to approve or
withhold approval of any contract, except for necessities, which Ballard may
wish to make; and to exercise general supervision over Ballard’s income and
resources.  This grant of authority was consistent with the
governing statute delineating the potential powers of a guardian, 14 V.S.A.
§ 3069, subject to the guardian’s overarching responsibility to manage the
ward’s affairs “in a manner most beneficial to the ward,” id.
§ 2797.

¶ 36.        
 In contrast to Bell’s authority to approve the mortgage, her power
within the bounds of her fiduciary obligations to approve contracts that
Ballard wished to make was not specifically constrained by any statute
requiring court approval.  Accordingly, if she “approved” the promissory
note signed by Ballard, his execution of that note would have been entirely
consistent with the constraints of his guardianship and the note would not be
unenforceable on the same basis as the mortgage.

¶ 37.        
The fact that this particular note was executed at the same time as a
mortgage does not change this analysis.  If, with Bell’s approval, Ballard
had executed an unsecured promissory note to CitiFinancial, nobody would try to
argue that the statutes requiring the probate court to approve the sale or
mortgage of a ward’s property would have applied to that note.  The
probate statutes prevent a guardian, without court approval, from pledging the
ward’s real property as security for such a note, but do nothing to limit the
guardian’s authority to approve the ward’s unsecured borrowing of money. 
The invalidity of the mortgage does not, in itself, establish the invalidity of
the underlying note because the effectiveness of the note, in contrast to the
mortgage, is not conditioned on judicial approval.

¶ 38.        
The dissent is right that the statute does give the probate court the
authority to restrict the terms of the underlying note as a condition of its
approval of a mortgage.  14 V.S.A. §§ 2201-2202.  The court may
withhold approval of a mortgage deed if the guardian fails to conform the
underlying note to the court’s requirements.  But it does not follow that
that the statute requires probate court approval of a promissory note in its
own right, rather than as a condition to the approval of a mortgage deed. 
The Legislature could reasonably conclude—and apparently has concluded—that
guardians are free to borrow money on a ward’s behalf when doing so is in the
ward’s best interests, but that probate court intervention in the transaction
is a precondition to use of the ward’s assets to secure the debt.  The
dissent’s construction of the word “mortgage” to mean a mortgage deed as well
as any promissory note purportedly secured by a mortgage, even if the purported
mortgage is invalid, combines two distinct legal concepts, relying on an
admittedly “loose” definition of mortgage.  Post, ¶ 46. 
When the Legislature uses legal terms of art, we presume that the Legislature
intended the terms to have their well-established legal meanings.  See Morissette
v. United States, 342 U.S. 246, 263 (1952).

¶ 39.        
For these reasons, we conclude that the trial court erred in analyzing the
note and mortgage as if they were one and the same, both subject to the
requirement of probate court approval.  We therefore reverse the award of
summary judgment to Ballard on CitiFinancial’s claim on the promissory note and
remand to the trial court for further proceedings on this claim.[7]

III.

¶ 40.        
We recognize that the statutes as currently written lead to potential
hardship for both parties in a transaction like this.  In the simple act
of refinancing a mortgage with a competent mortgagor who, unbeknownst to
CitiFinancial, was subject to a voluntary guardianship, the bank potentially
lost the security associated with a very substantial loan.  On the other
hand, the estate of a ward subject to the protection of a guardianship is now
subject to a very substantial debt incurred, or at least increased, during the
voluntary guardianship.  

¶ 41.        
The former consequence results from the absence of any statute or rule
requiring publication notice to protect creditors like CitiFinancial in this
case.  In the context of spendthrift trusts only, the Legislature has
required guardians to put potential creditors on notice by publication that
contracts made by the ward will be held void.  14 V.S.A. § 2690. 
Although the probate court has the discretion to require such notice in other
situations, see Vermont Rules of Probate Procedure 80.1, no statute or rule
requires publication notices in all cases in which a ward subject to a
voluntary guardianship cedes the power to independently enter into contracts
without the guardian’s approval.   

¶ 42.        
The latter consequence flows from the Legislature’s limitation of the
judicial oversight requirement to the execution of a mortgage deed in a case
like this.  If the Legislature intends to prohibit guardians from
approving the execution of promissory notes in cases like this, as the dissent
suggests, it can amend the statutes to so provide.

 

Affirmed in part, and
reversed and remanded in part for additional proceedings consistent with this
opinion.

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate
 Justice
 
  

 

¶ 43.        
SKOGLUND, J., dissenting.  The majority errs in concluding
that the probate court need only approve a “mortgage deed” but not the note
that gives life to that deed.  The law plainly requires court approval for
the entire transaction.  I would affirm the trial court’s order granting
summary judgment to the ward’s estate.  I therefore dissent.  

¶ 44.        
As the majority recognizes, any guardian who wishes to mortgage her
ward’s property must file a motion with the probate court.  The probate
court can authorize a mortgage only if it benefits the estate and serves one of
five enumerated purposes.  14 V.S.A. § 2201.  In its decree, the
probate court “shall fix the amount for which the mortgage
. . . may be given, the terms thereof and the rate of interest
which may be paid thereon.”  Id. § 2202 (emphasis
added).  This language can only refer to a promissory note that
accompanies a mortgage deed.  The use of the word “shall” means that this
is a mandatory, not a discretionary, requirement.  See, e.g., State v.
Rafuse, 168 Vt. 631, 632, 726 A.2d 18, 19 (1998) (mem.) (“Statutes
generally use ‘shall’ as imperative or mandatory language.  In its
ordinary significance, it is a word of command, and it is inconsistent with a
concept of discretion.” (citation omitted)).  

¶ 45.        
The majority simply ignores this language.  It construes the word
“mortgage” to mean a “mortgage deed,” ante ¶ 27, but it does not
explain how the probate court can set the amount, terms, and interest rate of a
deed.  The majority emphasizes the different legal obligations associated
with a note and a mortgage, but it does not explain why a difference in legal
effect obviates the plain language of the statute cited above.  The
majority eliminates this requirement from the statute, an approach we must
reject.  We “presume that language is inserted in a statute advisedly,”
and we “do not construe the statute in a way that renders a significant part of
it pure surplusage.”  Trombley v. Bellows Falls Union High Sch.,
160 Vt. 101, 104, 624 A.2d 857, 860 (1993) (quotation omitted).  

¶ 46.        
Applying well-established principles of statutory construction, it is
evident that the Legislature intended the word “mortgage” to include the loan
that accompanies the conveyance of a mortgage deed.  See In re Margaret
Susan P., 169 Vt. 252, 262, 733 A.2d 38, 46 (1999) (stating that, in
interpreting a statute, Court must consider it “as a whole, looking to the
reason and spirit of the law and its consequences and effects to reach a fair
and rational result”).  This interpretation recognizes the interrelated nature
of these two instruments.  See, e.g., Island Pond Nat’l Bank v. Lacroix,
104 Vt. 282, 294, 158 A. 684, 690 (1932) (explaining that when a mortgage is
used to secure payment of a debt, “the debt is the principal thing, and the
mortgage is an incident of it which accompanies and follows the debt wherever
that may be assigned”); Huntington v. McCarty, 174 Vt. 69, 71, 807 A.2d
950, 952 (2002) (when note and mortgage are made at same time, and in relation
to same subject, they are to be construed together as if they were parts of
same instrument).  It gives meaning to all of the statutory
language.  See, e.g., State v. Ben-Mont Corp., 163 Vt. 53, 57, 652
A.2d 1004, 1007 (1994) (“Our interpretation must . . . if
possible, give meaning and effect to all the statutory language.”).  It
carries out the purpose of the statute.  And it is consistent with a
dictionary definition of the term “mortgage.”  See Black’s Law Dictionary
1031 (8th ed. 2004) (defining “mortgage” to include “a deed or contract . . . specifying
the terms” of a conveyance of title to property that is given as security for
payment of debt, and also, “[l]oosely, the loan on which such a transaction is
based”).  Indeed, it applies the meaning of the term “mortgage” used in
common parlance.  When people talking about paying their “mortgage,” they
are referring to the loan that gave rise to a mortgage deed, not the mortgage
deed itself.  

¶ 47.        
The whole point of taking out a mortgage is to borrow money for the
ward’s benefit.  Thus, in filing a motion to mortgage real estate, a
guardian must describe “the amount of money necessary to be raised, the nature
and amount of the obligation to be secured, and the purpose for which the money
or security is required.”  14 V.S.A. § 2202.  The probate
division may authorize a mortgage only “to prevent a sacrifice of the estate;
to make repairs and improvements upon the estate; to pay debts, legacies or
charges of administration; to pay an existing mortgage, lien or tax on the
estate, or to support a ward.”  14 V.S.A § 2201.  Mindful of
these requirements, and the information provided by the guardian, the probate
court will assess what action is necessary to meet the ward’s needs and
determine, as directed by statute, the amount of any mortgage loan, its terms,
and an appropriate rate of interest.  This approach reflects the
Legislature’s careful decision to “guard[] the rights of wards in their real
estate.”  Doty v. Hubbard, 55 Vt. 278, 283 (1882). 

¶ 48.        
The majority reasons that, because no one would suggest that the
licensing law applied to an unsecured promissory note, the law must not apply
to promissory notes generally.  Ante ¶ 36.  This case is
not about a guardian’s general authority to execute promissory notes on behalf
of a ward, however.  Instead, this case involves a very specific type of
borrowing—the borrowing of money using the ward’s real estate as
security.  The Legislature has clearly limited a guardian’s ability to
engage in such transactions.  Whatever general authority guardians have to
borrow money for their wards, it is a basic principle of statutory construction
that “[a] more specific statutory provision will prevail according to its terms
over a more general statutory provision.”  Rafuse, 168 Vt. at 632,
726 A.2d at 19.  

¶ 49.        
In short, we need not wait for the Legislature to amend the laws to
prohibit guardians from unilaterally executing “mortgage loans” on behalf of
their wards.  The Legislature has already spoken and expressly prohibited
such transactions.  It has given the probate court, not the guardian or
the lender, the power to determine how much money may be borrowed against the
ward’s estate and at what rate.  The law was not followed here.  

¶ 50.        
I would affirm the trial court’s decision.  I am authorized to
state that Justice Burgess joins this dissent.


  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate Justice
 
  

 











[1] 
The statute was amended in 2008 to specifically provide that the guardian’s
power to approve or withhold approval of the sale or encumbrance of a ward’s
real property is subject to the real estate licensing provisions, see 2007, No.
186 (Adj. Sess.), but it is evident that obtaining a license to sell or
encumber has been a longstanding requirement.  See, e.g., Doty v.
Hubbard, 55 Vt. 278, 283 (1882) (“No guardian in this State, except by
express authority from the Probate Court, can convey lands owned by his ward,
lands held by his ward in trust, or consummate an agreement made by his ward,
by conveying land that the ward is under contract binding in law or equity to
convey.”).  Indeed, a license to sell a ward’s property has been required
since 1787, and the law concerning licenses for mortgages and leases of a
ward’s real property has been in effect since 1909.  See “An Act Providing
for, and Ordering, Transient, Idle, Impotent and Poor Persons,” R. 1787, pp.
111, 114 (requiring selectmen or other person to obtain license and authorization
from General Assembly to sell house or real property of “idiot, distracted, or
impotent person” for the use, relief, and benefit of that person, and stating
that “no Selectmen shall sell the land of such idle, mismanaging, or poor
person, without the order of the General Assembly”); see also 1908, No. 73, § 1
(original legislation concerning license to mortgage or lease ward’s property,
which is essentially the same as current statutory language, with the exception
that court may now approve guardian’s request to mortgage or pledge or assign
ward’s personalty for purpose of supporting the ward).  





[2] 
If the court finds that the statutory requirements are satisfied, it may order a
sale of the ward’s lands or the wards interest in such land as it deems
necessary.  Id. § 2882(4).  A copy of the order of sale
is recorded in the land records.  Id. § 2882(6).  The
guardian must also make a report concerning the sale, which he or she must file
with the probate division.  Id. § 2884.





[3] 
The “settlement statement” provided by CitiFinancial indicates that only
$3,224.15 of this amount was disbursed to the borrower, while $96,776.62 was
disbursed to others.  This latter amount includes $26,942.96 disbursed to
CitiFinancial, $2,601.51 to the Town of Hubbardton, and $67,232.15 to an
unidentified account.  

 





[4] 
While not discussed by the trial court, we note that, according to another
statute entitled “ward not to be sued,” which is drawn from an 1839 statute,
“[a] writ or execution shall not be issued against a ward for a debt while he
or she is under guardianship;” although “actions commenced against a person
before the appointment of his guardian may be prosecuted to final
judgment.”  14 V.S.A. § 2850.  

 





[5] 
Ballard died while this suit was pending and in October 2011, and Judith Balch,
as the Special Administrator of Ballard’s estate, was substituted as
defendant.  For convenience sake, we refer to defendant as Ballard or
“him.”  





[6] 
As guardian, Bell is subject to judicial oversight of her actions, 14 V.S.A.
§ 3062(b) and is accountable by bond to the court to account for the
property of the guardian’s estate.  14 V.S.A. §§ 2751, 2754.





[7]
 Finally, CitiFinancial appears to raise an equitable claim in its brief
that it did not include in its complaint.  It asserts that it relied on
Ballard’s and Bell’s acts and representations that Ballard had the authority to
encumber the property, and therefore, Ballard must be liable. 
CitiFinancial provides no legal authority in support of this argument nor does
it identify the exact nature of its claim.  While it asserted in its
opposition to summary judgment that it “relied” on Ballard’s and Bell’s acts
and representations, it did not tie these assertions to any particular
equitable claim and, as indicated, it raised no equitable claim in its
complaint.  Putting aside the issue of inadequate briefing, CitiFinancial,
having failed to properly raise an equitable claim below, cannot raise such a
claim here.