2013 VT 86

# CitiFinancial, Inc. v. Judith Balch, Special Administratrix of the Estate of Theodore Ballard

[86 A.3d 415]

No. 12-118

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed October 4, 2013

*Andrew H. Montroll* and *Amber L. Doucette* of *Bendett and McHugh, P.C.*, Burlington, for Plaintiff-Appellant.

*Judith Balch*, Pro Se, Castleton, Defendant-Appellee.

¶ 1. **Robinson, J.** Plaintiff CitiFinancial, Inc. appeals from the superior court's order granting summary judgment to defendant, the Estate of Theodore Ballard, on its foreclosure complaint. CitiFinancial argues that Ballard, who was under a voluntary guardianship, was bound by a mortgage deed and promissory note that he and his guardian co-signed, and that the trial court erred in concluding otherwise. We affirm in part and reverse and remand in part.

I.

¶ 2. We begin with an overview of the guardianship process. Vermont law has provided for voluntary guardianships since 1912.

Initially, such guardianships were available for those individuals over eighteen who deemed themselves "unfitted by reason of infirmity, age or other mental or physical disability, for the prudent management of [their] affairs." 14 V.S.A. § 2671 (1974). Prior to 1979, the law did not list the potential powers that a guardian could possess. Instead, all guardians in all types of adult guardianships had the same powers: "the possession and management" of their ward's estates, as well as "the care and custody" of the ward. *Id.* § 2692 (1974); see also *id.* § 2799 (providing that guardian could: "receive, sue for and recover, debts and demands due" to ward; "maintain and defend actions or suits," "settle accounts, demands, claims and actions at law or in equity by or against his ward").

¶ 3. Under this statutory scheme, guardians in all types of adult guardianships were required to give notice that their ward's future contracts and transfers of real or personal property would be held void. *Id.* § 2690. Guardians were also required, as they are today, to obtain a license from the probate court to sell or mortgage the ward's real estate, see *id.* §§ 2201, 2881-2891, but not to sell the ward's personal property. *Id.* § 2798.

¶ 4. The Legislature made numerous changes to the guardianship laws in 1979, essentially adopting the approach in place today. Section 2671 made voluntary guardianships available for any individual, eighteen years or older, who "desires assistance with the management of his or her affairs." 1979, No. 76, § 3; see also 14 V.S.A. § 2671(a) (2012) (same). As part of this overhaul of the guardianship statutes, the Legislature delineated specific powers that a guardian could possess in 14 V.S.A. § 3069. In voluntary guardianship cases, petitioners themselves specify which powers they wish the guardian to exercise from the list found in § 3069, while courts in involuntary guardianship cases choose which powers from § 3069 are appropriate and necessary. See 1979, No. 76, § 15; see also 14 V.S.A. §§ 2671(b)(2), 3069.

¶ 5. At the time of the guardianship petition in this case, § 3069 identified the following guardianship powers: the power to: (1) exercise general supervision over the ward; (2) approve or withhold approval of any contract, except for necessaries, which the ward wishes to make; (3) approve or withhold approval of the ward's request to sell or in any way encumber his personal or real property; (4) exercise general supervision over the income and resources of the ward; (5) consent to surgery or other medical

procedures subject to statutory or constitutional limitations; and (6) receive, sue for, and recover debts and demands due to the ward; maintain and defend actions or suits for the recovery or protection of the ward's person or property; settle accounts, demands, claims and actions at law or in equity by or against the ward, and compromise, release and discharge the same on such terms as he deems just and beneficial to the ward. 1979, No. 76, § 15. These are essentially the same powers identified in the current statute. See 14 V.S.A. § 3069(c)(1)-(6).

¶ 6. As indicated above, in involuntary guardianship cases, the court could appoint a "limited guardian," who could exercise only specified powers, or a "total guardian," who could exercise all of the powers of guardianship. 1979, No. 76, § 15; see also 14 V.S.A. § 3069(d)(1) (stating, under current law, that when guardian has been granted some but not all guardianship powers, guardianship is identified as a "limited guardianship" and guardian identified as a "limited guardian"). The law specifically provided that persons for whom a limited guardian was appointed retained all legal and civil rights except those that had been specifically granted to the limited guardian by the probate court. *Id.*; see also 14 V.S.A. § 3069(d)(2) (stating that, under current law, a person under limited guardianship retains all powers identified in § 3069(c) except those that have been specifically granted to limited guardian).

¶ 7. As of 1979, only guardians of spendthrifts were required to provide notice that their ward's "[c]ontracts, gifts, sales or transfers of real or personal estate made" after the guardian's appointment would be considered void. See 1979, No. 76, § 18. This was presumably done in recognition that, in all cases other than spendthrift guardianships, a ward might retain certain rights, such as the right to contract or convey real property. Compare 1979, No. 76, § 19 (guardians of spendthrifts shall have the possession and management of the estates of their wards), with *id.* § 15 (delineating powers of guardian and recognizing that in limited guardianships, ward retains "all legal and civil rights except those which have been specifically granted to the limited guardian by the court").

¶ 8. As stated above, guardians must obtain a license from the probate court to mortgage or sell a ward's real property. See 14 V.S.A. § 3069(c)(5) (stating that guardian's power to approve or withhold approval of sale or encumbrance of real property of person under guardianship is subject to the real estate licensing

provisions set forth in 14 V.S.A. §§ 2881-2891[1]); *id.* §§ 2201-2202 (setting forth requirements for mortgage or lease of ward's property). No license is required to sell a ward's personal property unless the proceeds of such sale are to be invested in real estate. *Id.* § 2798 (stating that guardian may sell ward's personal estate when necessary or for the ward's interest, and may use funds to pay necessary expenses of ward's maintenance and education); *id.* § 2803 (stating that on motion of guardian or other specified individuals, and following notice and hearing, probate division may authorize or require guardian to sell and transfer stock or other personal estate of ward, collect demands and invest in real estate the proceeds and moneys in guardian's hands if court deems it beneficial to ward); see also *In re Estate of Collette*, 122 Vt. 231, 235, 167 A.2d 361, 363 (1961) ("A guardian is not required to obtain a license to sell from the probate court before selling personal estate of his ward unless the proceeds of such sale are to be invested in real estate.").

¶ 9. This approach appears consistent with the general rule in other states. See, e.g., H.D.W., *Power of Guardian to Sell Ward's Property without Order of Court*, 108 A.L.R. 936, 937, 944 (1937) ("By the great weight of authority, a guardian, unless restrained from doing so by statute, has the power to sell his ward's personal property without an order of court. . . . It is a general rule that

---

[1] The statute was amended in 2008 to specifically provide that the guardian's power to approve or withhold approval of the sale or encumbrance of a ward's real property is subject to the real estate licensing provisions, see 2007, No. 186 (Adj. Sess.), § 1, but it is evident that obtaining a license to sell or encumber has been a longstanding requirement. See, e.g., *Doty v. Hubbard*, 55 Vt. 278, 283 (1882) ("No guardian in this State, except by express authority from the Probate Court, can convey lands owned by his ward, lands held by his ward in trust, or consummate an agreement made by his ward, by conveying land that the ward is under contract binding in law or equity to convey."). Indeed, a license to sell a ward's property has been required since 1787, and the law concerning licenses for mortgages and leases of a ward's real property has been in effect since 1909. See "An Act Providing for, and Ordering, Transient, Idle, Impotent and Poor Persons," R. 1787, pp. 111, 114 (requiring selectmen or other person to obtain license and authorization from General Assembly to sell house or real property of "idiot, distracted, or impotent person" for the use, relief, and benefit of that person, and stating that "no Selectmen shall sell the land of such idle, mismanaging, or poor person, without the order of the General Assembly"); see also 1908, No. 73, § 1 (original legislation concerning license to mortgage or lease ward's property, which is essentially the same as current statutory language, with the exception that court may now approve guardian's request to mortgage or pledge or assign ward's personalty for purpose of supporting the ward).

a guardian has no authority to sell real estate of his ward without an order of court, in the absence of a statute expressly or by implication conferring the power or authority otherwise conferred upon ·him, as by will.").

¶ 10. Under Vermont law, a license to sell a part or all of the lands of a ward or the interest of such wards in real estate, vested or contingent, will be granted only if the court finds that: (1) the ward's personal estate is insufficient to pay the expenses of maintaining the ward and his or her family, or of educating a minor ward as his or her circumstances require; (2) the ward's personal estate is insufficient to pay his or her debts contracted before or after the appointment of his or her guardian; or (3) it appears to the court conducive to the ward's interest to sell the real estate, or an interest vested or contingent therein, and put the proceeds at interest or invest it in stocks or in real estate. 14 V.S.A. § 2881. Procedural requirements for granting such a license include notice and a hearing, at which the guardian must produce proof of the value of the estate to be sold, the interest of the ward therein, and of the necessity of sale; the guardian may also be required to post a bond. *Id.* § 2882(1)-(3).[2]

¶ 11. Cross-referenced in the provision governing the sale of real estate is 14 V.S.A. § 2201, which governs the execution of mortgages and leases by guardians and other fiduciaries such as executors, administrators, and trustees. The law provides that, "[i]f on motion and after notice and hearing it appears to be for the benefit of the estate," the probate court "may authorize a fiduciary to mortgage any of the real estate or to mortgage, pledge or assign any of the personalty of the estate" for certain specified purposes. *Id.* These purposes include the following: "to prevent a sacrifice of the estate; to make repairs and improvements upon the estate; to pay debts, legacies or charges of administration; to pay an existing mortgage, lien or tax on the estate, or to support a ward." *Id.*

¶ 12. ■ In his or her motion, the guardian must describe "the property to be mortgaged, pledged or assigned, the amount of

---

[2] If the court finds that the statutory requirements are satisfied, it may order a sale of the ward's lands or the ward's interest in such land as it deems necessary. *Id.* § 2882(4). A copy of the order of sale is recorded in the land records. *Id.* § 2882(6). The guardian must also make a report concerning the sale, which he or she must file with the probate division. *Id.* § 2885.

money necessary to be raised, the nature and amount of the obligation to be secured and the purpose for which the money or security is required." *Id.* § 2202. If the request is approved, the probate court will:

> fix the amount for which the mortgage, pledge or assignment may be given, the terms thereof and the rate of interest which may be paid thereon, and the court may order the whole or any part of the money secured by the mortgage to be paid from time to time out of the income of the property mortgaged.

*Id.* As these regulations reflect, "[t]he legislative power has, with great care, guarded the rights of wards in their real estate." *Doty,* 55 Vt. at 283; see also *Burnell v. Malony,* 36 Vt. 636, 638 (1864) (observing that regulations governing the issuance of licenses to sell reflect the "jealous care" with which the rights of wards are guarded).

¶ 13. Notwithstanding the changes made in 1979, or perhaps because of them, Title 14 is confusing in many respects and it contains provisions that are potentially contradictory. The 1979 amendments and additions to the law governing guardianships do not appear to have addressed all statutes pertaining to the powers and duties of guardians. Older statutes that remain compete with the more recent amendments. The result is a hodgepodge. For example, 14 V.S.A. § 2798 remains essentially as it was in 1797, and provides that a guardian may sell a ward's personal estate when necessary or for the ward's interest, and use funds to pay necessary expenses of the ward's maintenance and education. This statute now seems to be encompassed by 14 V.S.A. § 3069(c)(3), which gives a guardian the power to "liquidate personal property for the benefit of the person under guardianship."

¶ 14. In a similar vein, 14 V.S.A. § 2801, which is essentially unchanged since 1839, allows a guardian to discharge a mortgage when the proper sum is paid to the guardian, release any claim of his ward as mortgagee, and "give the consent of his ward to the sale of real estate when such consent is required by law." This would appear to be a power that a person under a voluntary guardianship might want to give a guardian, but then again, the person might not; if a person seeking voluntary guardianship does not request that the guardian have such power, and the court does not incorporate the power into an order, this provision would seem a usurpation of the ward's retained rights.

¶ 15. We note, moreover, that the provision governing licenses to mortgage a ward's real estate, while cross-referenced in the "guardianship" chapter of Title 14, is contained in a different chapter of Title 14. This could lead to it being overlooked, as it was by the court and the parties in this case. Additionally, in describing the powers of a guardian, 14 V.S.A. § 3069(c)(5) provides that a guardian's power to approve or withhold approval of sale or "encumbrance" of real property of a person under guardianship is subject to the real estate licensing provisions set forth in 14 V.S.A. §§ 2881-2891. The reference to an "encumbrance" is somewhat confusing in that an encumbrance of property involving a mortgage is presumably covered by 14 V.S.A. § 2201 rather than § 2881. While there is some overlap in the court findings necessary to warrant a mortgage and a sale, they are not the same. Compare *id.* § 2201 (mortgage may be authorized "to prevent a sacrifice of the estate; to make repairs and improvements upon the estate; to pay debts, legacies or charges of administration; to pay an existing mortgage, lien or tax on the estate, or to support a ward"), with *id.* § 2881 (sale of land or interest in land may be authorized when: ward's personal estate is "insufficient to pay expenses of maintaining the ward and his or her family, or of educating a minor ward as his or her circumstances require"; when ward's personal estate is "insufficient to pay his or her debts contracted before or after the appointment of his or her guardian"; or "when it appears to the court conducive to the interest of the ward to sell the real estate, or an interest vested or contingent therein, and put the proceeds at interest or invest it in stocks or in real estate"). While these issues do not affect the resolution of this case, they do highlight the need for legislative clarification of the laws governing guardianships.

## II.

¶ 16. With this background in mind, we turn to the facts of this case. Ballard filed a petition for a voluntary guardianship in May 2005. Ballard was seventy-one years old at the time and apparently could not read. In June 2005, following a hearing, the Fair Haven Probate Court appointed Ballard's niece, Leala Bell, as Ballard's guardian. Bell was granted powers of guardianship that included the power to approve or withhold approval of any contract, except for necessaries, which the ward wished to make,

and the power to approve or withhold approval of the ward's request to sell or in any way encumber his personal or real property.

¶ 17. On June 30, 2008, in the context of a refinance ˙of the mortgage on Ballard's property, Ballard and Bell executed a promissory note in CitiFinancial's favor for $102,670.28, with interest accruing at 12.16%.[3] Bell signed the promissory note as a "borrower"; she did not expressly indicate that she was signing as Ballard's guardian or that her signature indicated only her "approval" of Ballard's action. The loan was secured by a mortgage on Ballard's real property. The mortgage deed granted and conveyed Ballard's property to CitiFinancial, including the power to sell the property. Ballard signed the mortgage deed but Bell did not. There was no showing that the probate court licensed the mortgage.

¶ 18. Not long thereafter, CitiFinancial sought to foreclose on the property. In August 2009, Bell requested that her role as guardian be terminated. Following a hearing, the probate court terminated her appointment and appointed Judith Balch and Lisa Kemp as co-guardians. In October 2009, following the dismissal of a prior complaint due to inadequate service, CitiFinancial sued Ballard.[4] This complaint was also dismissed after CitiFinancial failed to comply with a court order to correct several errors in its motion for summary judgment. In June 2010, CitiFinancial filed the instant foreclosure complaint against Ballard.[5] CitiFinancial alleged that Ballard had failed to make the payments called for under the note and mortgage, and thereby breached these agreements.

---

[3] The "settlement statement" provided by CitiFinancial indicates that only $3,224.15 of this amount was disbursed to the borrower, while $96,776.62 was disbursed to others. This latter amount includes $26,942.96 disbursed to CitiFinancial, $2,601.51 to the Town of Hubbardton, and $67,232.15 to an unidentified account.

[4] While not discussed by the trial court, we note that, according to another statute entitled "ward not to be sued," which is drawn from an 1839 statute, "[a] writ or execution shall not be issued against a ward for a debt while he or she is under guardianship;" although "actions commenced against a person before the appointment of his guardian may be prosecuted to final judgment." 14 V.S.A. § 2850.

[5] Ballard died while this suit was pending, and in October 2011 Judith Balch, as the special administrator of Ballard's estate, was substituted as defendant. For convenience sake, we refer to defendant as Ballard or "him."

¶ 19. Ballard moved for summary judgment, arguing in relevant part that he lacked the legal capacity to execute a mortgage deed and promissory note while he was under guardianship. Ballard also asserted that no license had been granted with respect to any mortgage on his property. Ballard argued that a Motion for License to Sell Real Estate, which required a hearing before the probate court, served to protect the ward's interest, and in this case, it did not appear that the loan funds had been used for the ward's benefit. CitiFinancial opposed the motion, arguing that Ballard failed to show that he lacked the ability to contract or that he did not agree to the promissory note and mortgage.

¶ 20. In a February 2012 decision and order, the court granted summary judgment to Ballard. It found that the guardian here had total powers over Ballard's affairs with no powers reserved for the ward. Because the probate court did not approve the note and mortgage and Ballard was under a valid guardianship at the time they were executed, they were not enforceable against Ballard or his estate. While the guardian might be liable to CitiFinancial, the court explained, Ballard's estate was not, nor was its real estate subject to CitiFinancial's mortgage. Neither the court nor any of the parties referred to 14 V.S.A. § 2201, which specifically addresses the mortgage of a ward's property. Instead, the court relied on 14 V.S.A. § 2881, which addresses the sale of a ward's land or of the ward's interest in land. CitiFinancial appealed from the court's order.

¶ 21. We review a grant of summary judgment using the same standard as the trial court. *Richart v. Jackson*, 171 Vt. 94, 97, 758 A.2d 319, 321 (2000). Summary judgment is appropriate when, taking all allegations made by the nonmoving party as true, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.*; V.R.C.P. 56(a).

¶ 22. CitiFinancial argues that the promissory note and mortgage deed are valid and enforceable against Ballard. According to CitiFinancial, after his guardian was appointed, Ballard could continue to execute contracts or encumber his own property as long as he had his guardian's approval. CitiFinancial asserts that Bell's signature as a co-borrower on the promissory note and settlement statement evidence her "approval" of Ballard's execution of the promissory note, and that Bell approved of Ballard's execution of the mortgage deed because the execution of the promissory note and the mortgage deed, along with the other closing documents, were all part of the same transaction.

¶ 23. As to the statute governing the sale of a ward's real estate, 14 V.S.A. § 2887, CitiFinancial maintains that a license to sell was not required because this was "simply a contract to borrow and repay certain funds" and because Ballard's property was not actually sold. Even if this statute applied to the granting of mortgages, CitiFinancial asserts that it is limited to those situations where it is the guardian who seeks to sell the property. According to CitiFinancial, this law does not restrict a ward from selling his or her own property. CitiFinancial does not discuss the law governing licenses to mortgage a ward's property, 14 V.S.A. § 2201.

## A.

¶ 24. ■ First we consider whether the ward was required to obtain his guardian's approval of the note and mortgage and, if so, whether Bell's signature on the note as a cosigner sufficiently evidenced such approval. CitiFinancial appears to concede that, pursuant to the terms of the guardianship here, the ward was required to obtain his guardian's approval to execute the promissory note and the mortgage deed. Obviously, the ward could have retained the power to enter into contracts (other than for necessaries, which he did retain) or the power to sell or encumber his real property. Instead, he specifically requested that his ability to exercise these powers be subject to approval of his guardian, and the probate court issued an order to this effect. Given that the guardian has both the power to approve and to "withhold approval" of the ward's proposed transactions, the ward cannot act independently in these matters. If the ward could continue to act unilaterally, the guardian would be unable to fulfill his or her statutory obligation to manage the ward's estate "frugally and without waste and in a manner most beneficial to the ward," 14 V.S.A. § 2797, and the probate division's supervisory function would be impeded. A competent ward who wishes to retain the power to convey the ward's property unilaterally can do so under the guardianship laws. But once the ward has conveyed this power to the guardian, he or she must modify the terms of the guardianship in order to recover that right.

¶ 25. ■ ■ There is no dispute that Bell signed the promissory note below Ballard on a line bearing the preprinted designation "Borrower," with no reference to her status as Ballard's guardian.

The question is whether, on the basis of this fact, the court could conclude that Bell approved his entering into this contract. A factfinder could easily infer that Bell's signature reflected her assent to the loan. It is hard to imagine any other plausible inference. The question of the "capacity" in which she signed the document may very well be critical to an assessment of Bell's own personal liability on the note, but is not determinative of the question of whether she approved his entering into the contract.[6] The guardianship order in this case and the underlying statute required Bell's approval of Ballard's execution of the contract; they do not prescribe any particular requirements for documenting that approval, and do not require her to cosign agreements executed by Ballard with her approval, let alone to cosign in a particular "capacity." 14 V.S.A. § 3069. The statute simply requires her approval.

¶ 26. Ballard's argument relies on the notion that Bell participated in the transaction with CitiFinancial, subjected herself to personal liability as a cosigner of the note, signed the settlement statement as well as the promissory note, but did not actually approve Ballard's signing of the note. This narrative is not compelled by the undisputed facts; in fact, it is hard to square with the record.

### B.

¶ 27. ▆▆ We next consider whether the absence of a license from the probate court affects the validity of the note and mortgage. The law plainly requires probate court approval for the issuance of a mortgage deed. See 14 V.S.A. §§ 2201-2202. A guardian must seek such approval by motion, *id.* § 2202, and the court must find that the mortgage will satisfy one of the specifically enumerated statutory purposes. It is undisputed that the guardian failed to comply with this statute here. The mortgage deed is therefore ineffective. See, e.g., *Slafter v. Savage*, 89 Vt. 352, 355, 95 A. 790, 791 (1915) ("A guardian can only dispose of the real estate of his ward by proceeding in accordance with statutory provisions . . . .").

¶ 28. ▆ We reject CitiFinancial's suggestion that the licensing requirements do not apply when a ward subject to a *voluntary*

---

[6] As guardian, Bell is subject to judicial oversight of her actions, 14 V.S.A. § 3062(b), and is accountable by bond to the court to account for the property of the guardian's estate. 14 V.S.A. §§ 2751, 2754.

guardianship, as opposed to the guardian, seeks to sell property. This makes no sense in cases where, as here, the ward has essentially ceded the power to approve a sale or encumbrance of real property to a guardian. Having done so, the ward cannot then act unilaterally. CitiFinancial cites no case where a court has found that a ward in a voluntary guardianship can continue to convey or encumber property unilaterally once the ward has assigned such power to a guardian. In fact, there is authority to the contrary. In *Bryan v. Century National Bank*, 498 So. 2d 868 (Fla. 1986), the Florida Supreme Court concluded that where a competent ward had surrendered control of her property to a voluntary guardian, the ward could no longer unilaterally transfer that property. In reaching its conclusion, the court recognized the significant difference between voluntary and involuntary guardianships — the former available only to competent individuals. In recognition of this difference, it found that the law allowed wards in voluntary guardianships to determine what property would be subject to a guardian's control. The property so included was subject to court protection and court supervision, and the ward, although mentally competent, could no longer freely deal with such property. *Id.* at 871. The court emphasized that wards were free at the outset to exclude certain property from the guardian's oversight, and they remained free at any time to modify or terminate the guardianship and dispose of their property as they saw fit. As it explained, the guardianship was for the ward's convenience, and the guardian's control over such property continued only so long as the ward desired. *Id.* at 871-72.

¶ 29. An Ohio court reached an analogous conclusion in *In re Tillman*, 137 N.E.2d 172 (Ohio Prob. Ct. 1956), although the probate laws at issue differ somewhat from Vermont law. In that case, the court held that a mentally competent individual who agreed to a guardianship did not retain dominion over her property and could not direct the expenditures of her own money and the disposition of her own property. The court found that, other than the appointment process, its probate laws made no distinction between a guardianship for a mentally incompetent person and a person rendered incompetent by reason of physical disability or infirmity. *Id.* at 174. Given this, the court found that it would be "highly improper" for the court to create such a distinction "by judicial fiat." *Id.*

¶ 30. The court in *Tillman* found that when the ward consented to the guardianship, "she waived her constitutional rights to

control the disposition of her own property and consented to having her property administered by a guardian who was subject to the rules of law and the supervision of the probate court." *Id.* at 175. It emphasized that the ward did not have to so consent, and at any time during the guardianship, she could have requested its termination. The court concluded that to allow the ward to act unilaterally would make the guardian "an agent of [the] ward, rather than an officer of the Court, and to substitute the judgment of the ward for the judgment of a court of law." *Id.* It rejected the notion that the "services of a court of law" could "be enlisted for rubber stamp purposes." *Id.*

¶ 31. █ CitiFinancial cites no case law in support of its position and we find none. We similarly find nothing in our statutes to support CitiFinancial's position. While our statutes emphasize cooperation between guardian and ward in all types of guardianships, our Legislature has not defined a different set of powers and duties for guardians in voluntary guardianships as opposed to involuntary guardianships. The primary difference between the guardianships is the method by which the guardian is appointed and the competent ward's ability to choose which powers the guardian will exercise. See, e.g., *Bryan*, 498 So. 2d at 874 (Boyd, J., dissenting) ("The difference between voluntary and involuntary guardianships is not in the responsibilities or duties of the guardian once appointed, but rather in the process of the appointment of the guardian."); see also *In re Guardianship of Anderson*, 78 N.W.2d 788, 791 (Iowa 1956) (finding no basic difference under Iowa law between powers and duties of voluntary and involuntary guardians).

¶ 32. █ █ Nor does the plain language of the relevant licensing statutes distinguish between guardians in voluntary or involuntary guardianships. Instead, the statutes refer generally to "guardians" or "fiduciaries," which include guardians. See 14 V.S.A. §§ 2201, 2881. As stated above, guardians in both types of guardianships derive their powers from the same statute. See *id.* § 3069; *id.* § 2671(b)(2) (person seeking voluntary guardianship shall specify which of the powers of the guardian as set forth in § 3069 he or she requests to be exercised by the guardian). In fact, 14 V.S.A. § 3069(c)(5) now explicitly states that a guardian's power to approve or withhold approval of the sale or encumbrance of a ward's real property is subject to the licensing requirements

set forth in 14 V.S.A. §§ 2881-2891, although this has long been required under our law. See, e.g., *Doty*, 55 Vt. at 283.

¶ 33. ██ ██ The law governing mortgages by guardians similarly does not limit its application to involuntary guardianship cases. Instead, it applies to any fiduciary who seeks to mortgage his or her ward's property. See *Wright v. Atwood*, 195 P. 625, 627 (Idaho 1921) ("The courts quite generally agree that in the absence of [a] statute authorizing such proceedings a guardian has no power to mortgage the ward's real estate."). As the *Wright* court observed, "If the power to mortgage [a] ward's estate has been given to a guardian, it must be plainly and unequivocally conferred, and it is limited to the purpose expressed in the statute, and must be exercised in the exact manner prescribed therein." *Id.* The language of our statutes is plain and their purpose is clear. We must enforce the statutes as written. *Rochon v. State*, 2004 VT 77, ¶ 8, 177 Vt. 144, 862 A.2d 801; see also *Brennan v. Town of Colchester*, 169 Vt. 175, 177, 730 A.2d 601, 603 (1999) ("We will not read an implied condition into a statute unless it is necessary in order to make the statute effective." (emphasis omitted) (quotation omitted)). For these reasons, we conclude that the mortgage deed executed by Ballard is ineffective.

¶ 34. ██ ██ We reach a different conclusion with respect to the promissory note. Although the mortgage deed purportedly executed by Ballard and the promissory note secured by that deed were executed as part of the same overall transaction, the two documents created distinct legal obligations. The promissory note purportedly gave rise to Ballard's personal liability for repayment of the loan. The mortgage purportedly provided security to CitiFinancial and a means for collecting at least part of the note against the property in the event of a default. *Pomfret Farms Ltd. P'ship v. Pomfret Assocs.*, 174 Vt. 280, 283, 811 A.2d 655, 658 (2002) ("The mortgage and the note are distinct, however, and, while the mortgage does not impose any personal liability on the defendant, a personal obligation is imposed on the underlying note."); *LaFarr v. Scribner*, 150 Vt. 159, 161, 549 A.2d 651, 652 (1988) ("Neither the mortgage nor the judgment impose any personal liability on defendants. The only personal obligation of defendants is on the underlying note.").

¶ 35. The authority specifically granted to Bell by the guardianship order included the power to exercise general supervision

over Ballard; to approve or withhold approval of any contract, except for necessities, which Ballard may wish to make; and to exercise general supervision over Ballard's income and resources. This grant of authority was consistent with the governing statute delineating the potential powers of a guardian, 14 V.S.A. § 3069, subject to the guardian's overarching responsibility to manage the ward's affairs "in a manner most beneficial to the ward," *id.* § 2797.

¶ 36. In contrast to Bell's authority to approve the mortgage, her power within the bounds of her fiduciary obligations to approve contracts that Ballard wished to make was not specifically constrained by any statute requiring court approval. Accordingly, if she "approved" the promissory note signed by Ballard, his execution of that note would have been entirely consistent with the constraints of his guardianship and the note would not be unenforceable on the same basis as the mortgage.

¶ 37. ▇ The fact that this particular note was executed at the same time as a mortgage does not change this analysis. If, with Bell's approval, Ballard had executed an unsecured promissory note to CitiFinancial, nobody would try to argue that the statutes requiring the probate court to approve the sale or mortgage of a ward's property would have applied to that note. The probate statutes prevent a guardian, without court approval, from pledging the ward's real property as security for such a note, but do nothing to limit the guardian's authority to approve the ward's unsecured borrowing of money. The invalidity of the mortgage does not, in itself, establish the invalidity of the underlying note because the effectiveness of the note, in contrast to the mortgage, is not conditioned on judicial approval.

¶ 38. ▇ The dissent is right that the statute does give the probate court the authority to restrict the terms of the underlying note as a condition of its approval of a mortgage. 14 V.S.A. §§ 2201-2202. The court may withhold approval of a mortgage deed if the guardian fails to conform the underlying note to the court's requirements. But it does not follow that the statute requires probate court approval of a promissory note in its own right, rather than as a condition to the approval of a mortgage deed. The Legislature could reasonably conclude — and apparently has concluded — that guardians are free to borrow money on a ward's behalf when doing so is in the ward's best interests,

but that probate court intervention in the transaction is a precondition to use of the ward's assets to secure the debt. The dissent's construction of the word "mortgage" to mean a mortgage deed as well as any promissory note purportedly secured by a mortgage, even if the purported mortgage is invalid, combines two distinct legal concepts, relying on an admittedly "loose" definition of mortgage. *Post*, ¶ 46. When the Legislature uses legal terms of art, we presume that the Legislature intended the terms to have their well-established legal meanings. See *Morissette v. United States*, 342 U.S. 246, 263 (1952).

¶ 39. For these reasons, we conclude that the trial court erred in analyzing the note and mortgage as if they were one and the same, both subject to the requirement of probate court approval. We therefore reverse the award of summary judgment to Ballard on CitiFinancial's claim on the promissory note and remand to the trial court for further proceedings on this claim.[7]

## III.

¶ 40. We recognize that the statutes as currently written lead to potential hardship for both parties in a transaction like this. In the simple act of refinancing a mortgage with a competent mortgagor who, unbeknownst to CitiFinancial, was subject to a voluntary guardianship, the bank potentially lost the security associated with a very substantial loan. On the other hand, the estate of a ward subject to the protection of a guardianship is now subject to a very substantial debt incurred, or at least increased, during the voluntary guardianship.

¶ 41. The former consequence results from the absence of any statute or rule requiring publication notice to protect creditors like CitiFinancial in this case. In the context of spendthrift trusts only, the Legislature has required guardians to put potential creditors on notice by publication that contracts made by the ward

---

[7] Finally, CitiFinancial appears to raise an equitable claim in its brief that it did not include in its complaint. It asserts that it relied on Ballard's and Bell's acts and representations that Ballard had the authority to encumber the property, and therefore, Ballard must be liable. CitiFinancial provides no legal authority in support of this argument nor does it identify the exact nature of its claim. While it asserted in its opposition to summary judgment that it "relied" on Ballard's and Bell's acts and representations, it did not tie these assertions to any particular equitable claim and, as indicated, it raised no equitable claim in its complaint. Putting aside the issue of inadequate briefing, CitiFinancial, having failed to properly raise an equitable claim below, cannot raise such a claim here.

will be held void. 14 V.S.A. § 2690. Although the probate court has the discretion to require such notice in other situations, see Vermont Rules of Probate Procedure 80.1, no statute or rule requires publication notices in all cases in which a ward subject to a voluntary guardianship cedes the power to independently enter into contracts without the guardian's approval.

¶ 42. The latter consequence flows from the Legislature's limitation of the judicial oversight requirement to the execution of a mortgage deed in a case like this. If the Legislature intends to prohibit guardians from approving the execution of promissory notes in cases like this, as the dissent suggests, it can amend the statutes to so provide.

*Affirmed in part, and reversed and remanded in part for additional proceedings consistent with this opinion.*

¶ 43. **Skoglund, J., dissenting.** The majority errs in concluding that the probate court need only approve a "mortgage deed" but not the note that gives life to that deed. The law plainly requires court approval for the entire transaction. I would affirm the trial court's order granting summary judgment to the ward's estate. I therefore dissent.

¶ 44. As the majority recognizes, any guardian who wishes to mortgage her ward's property must file a motion with the probate court. The probate court can authorize a mortgage only if it benefits the estate and serves one of five enumerated purposes. 14 V.S.A. § 2201. In its decree, the probate court "*shall* fix the amount for which the mortgage . . . may be given, the terms thereof and the rate of interest which may be paid thereon." *Id.* § 2202 (emphasis added). This language can only refer to a promissory note that accompanies a mortgage deed. The use of the word "shall" means that this is a mandatory, not a discretionary, requirement. See, e.g., *State v. Rafuse*, 168 Vt. 631, 632, 726 A.2d 18, 19 (1998) (mem.) ("Statutes generally use 'shall' as imperative or mandatory language. In its ordinary significance, it is a word of command, and it is inconsistent with a concept of discretion." (citation omitted)).

¶ 45. The majority simply ignores this language. It construes the word "mortgage" to mean a "mortgage deed," *ante*, ¶ 27, but it does not explain how the probate court can set the amount, terms, and interest rate of a deed. The majority emphasizes the different legal obligations associated with a note and a mortgage,

but it does not explain why a difference in legal effect obviates the plain language of the statute cited above. The majority eliminates this requirement from the statute, an approach we must reject. We "presume that language is inserted in a statute advisedly," and we "do not construe the statute in a way that renders a significant part of it pure surplusage." *Trombley v. Bellows Falls Union High Sch.*, 160 Vt. 101, 104, 624 A.2d 857, 860 (1993) (quotation omitted).

¶ 46. Applying well-established principles of statutory construction, it is evident that the Legislature intended the word "mortgage" to include the loan that accompanies the conveyance of a mortgage deed. See *In re Margaret Susan P.*, 169 Vt. 252, 262, 733 A.2d 38, 46 (1999) (stating that, in interpreting a statute, Court must consider it "as a whole, looking to the reason and spirit of the law and its consequences and effects to reach a fair and rational result"). This interpretation recognizes the interrelated nature of these two instruments. See, e.g., *Island Pond Nat'l Bank v. Lacroix*, 104 Vt. 282, 294, 158 A. 684, 690 (1932) (explaining that when a mortgage is used to secure payment of a debt, "the debt is the principal thing, and the mortgage is an incident of it which accompanies and follows the debt wherever that may be assigned"); *Huntington v. McCarty*, 174 Vt. 69, 71, 807 A.2d 950, 952 (2002) (when note and mortgage are made at same time, and in relation to same subject, they are to be construed together as if they were parts of same instrument). It gives meaning to all of the statutory language. See, e.g., *State v. Ben-Mont Corp.*, 163 Vt. 53, 57, 652 A.2d 1004, 1007 (1994) ("Our interpretation must . . . if possible, give meaning and effect to all the statutory language."). It carries out the purpose of the statute. And it is consistent with a dictionary definition of the term "mortgage." See Black's Law Dictionary 1031 (8th ed. 2004) (defining "mortgage" to include "a deed or contract . . . specifying the terms" of a conveyance of title to property that is given as security for payment of debt, and also, "[l]oosely, the loan on which such a transaction is based"). Indeed, it applies the meaning of the term "mortgage" used in common parlance. When people talk about paying their "mortgage," they are referring to the loan that gave rise to a mortgage deed, not the mortgage deed itself.

¶ 47. The whole point of taking out a mortgage is to borrow money for the ward's benefit. Thus, in filing a motion to mortgage

real estate, a guardian must describe "the amount of money necessary to be raised, the nature and amount of the obligation to be secured and the purpose for which the money or security is required." 14 V.S.A. § 2202. The probate division may authorize a mortgage only "to prevent a sacrifice of the estate; to make repairs and improvements upon the estate; to pay debts, legacies or charges of administration; to pay an existing mortgage, lien or tax on the estate, or to support a ward." 14 V.S.A. § 2201. Mindful of these requirements, and the information provided by the guardian, the probate court will assess what action is necessary to meet the ward's needs and determine, as directed by statute, the amount of any mortgage loan, its terms, and an appropriate rate of interest. This approach reflects the Legislature's careful decision to "guard[] the rights of wards in their real estate." *Doty v. Hubbard*, 55 Vt. 278, 283 (1882).

¶ 48. The majority reasons that, because no one would suggest that the licensing law applied to an unsecured promissory note, the law must not apply to promissory notes generally. *Ante*, ¶ 36. This case is not about a guardian's general authority to execute promissory notes on behalf of a ward, however. Instead, this case involves a very specific type of borrowing — the borrowing of money using the ward's real estate as security. The Legislature has clearly limited a guardian's ability to engage in such transactions. Whatever general authority guardians have to borrow money for their wards, it is a basic principle of statutory construction that "[a] more specific statutory provision will prevail according to its terms over a more general statutory provision." *Rafuse*, 168 Vt. at 632, 726 A.2d at 19.

¶ 49. In short, we need not wait for the Legislature to amend the laws to prohibit guardians from unilaterally executing "mortgage loans" on behalf of their wards. The Legislature has already spoken and expressly prohibited such transactions. It has given the probate court, not the guardian or the lender, the power to determine how much money may be borrowed against the ward's estate and at what rate. The law was not followed here.

¶ 50. I would affirm the trial court's decision. I am authorized to state that Justice Burgess joins this dissent.